754 A.2d 581 (2000)
333 N.J. Super. 42
STATE of New Jersey, Plaintiff-Appellant,
v.
Simon NUNEZ, Roberto A. Almonte and Ruben Gomez, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 2000.
Decided July 13, 2000.
Steven E. Braun, Senior Assistant Prosecutor, argued the cause for appellant (Ronald S. Fava, Passaic County Prosecutor, attorney; Mr. Braun, of counsel and on the brief).
Matthew T. Priore, Paterson, argued the cause for respondent Simon Nunez (Mr. Priore, attorney; Peter J. Foy and Mr. Priore, of counsel and on the brief).
Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for respondent Roberto A. Almonte (Ivelisse Torres, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
Gregory Aprile, Wayne, appeared for defendant Ruben Gomez and relied upon the briefs filed by respondents.
Before Judges KESTIN, WEFING and STEINBERG.
The opinion of the court was delivered by WEFING, J.A.D.
The State of New Jersey appeals, pursuant to leave granted, from the trial court's order granting defendants' motion to suppress. We reverse and remand for further proceedings.
On October 30, 1998, members of the Paterson Police Department arrested defendants Simon Nunez, Ruben Gomez and Roberto Almonte in Paterson, New Jersey. Nunez and Gomez were later indicted for possession of a controlled dangerous substance, possession with intent to distribute, possession with intent to distribute within 1,000 feet of school property, distribution of a controlled dangerous substance and distribution within 1,000 feet of school property; the only charge asserted against Almonte was possession of a controlled dangerous substance.
On October 28, 1998, Paterson Detectives Bailey and Robinson applied for a search warrant for 103 Mill Street in Paterson and submitted an affidavit detailing a controlled buy of a controlled dangerous substance that a reliable confidential informant had made at that address from a Hispanic male known as Ruben. Within their affidavit, the detectives requested that the warrant be issued on a "no-knock" basis "for the safety of the officers involved and due to the easy destruction of evidence."
Municipal Court Judge Philip Fenster reviewed the affidavit and concluded there was probable cause to issue a warrant. He did so, but did not include a "no-knock" *582 provision. The warrant was limited to the second floor apartment.
The building itself is somewhat small; it contains three separate apartments, one on each of the building's three floors. The property on which the building sits slopes slightly upward to the rear; when viewed from the rear, the first, or lower, floor apartment appears as if it could be described as a basement apartment. The front door opens immediately onto Mill Street; there are three separate mailboxes on the front door but no indication on the rear door of separate apartments. After walking up the driveway's incline, one must still go up four steps to reach a small porch or landing and the rear entry door.
On entering through the front door, one steps into a small hallway. The door to the first floor apartment is immediately to the left while straight ahead is a narrow stairway leading to the second floor. If one enters through the rear door, the door to the second floor apartment is immediately to the right. To the left is the stairway to the first floor, while straight ahead is a narrow hall leading to the stairs to the third floor apartment.
The warrant was executed on October 30, 1998 under the supervision of Detective Bailey, who observed from a nearby surveillance point. From his vantage point, Bailey did not have a view of the rear door. Four other detectives entered the building from the rear. The testimony about the manner in which the police executed this warrant was contradictory. Detective Bailey, who did not leave his surveillance point while the warrant was being executed, testified that Detective Formentin "breached" the rear door with a battering ram and that seconds later, defendant Gomez fled the building through the front door. Detective Daniel Rooney, however, who was a member of the entry team, testified that the rear entry door was unlocked and may have been ajar; he said Detective Rodriguez simply opened that door and the team entered the building. Rooney testified twice during this motion. On his second time as a witness, he reiterated that the rear entry door was unlocked but said that Rodriguez had to push the door open to enter the building.
According to Detective Rooney, he and Rodriguez saw defendants Gomez and Almonte in the first floor hallway engaging in a drug sale and the two detectives headed downstairs toward the two defendants. Gomez escaped through the front door and was subsequently captured. Almonte was arrested in the hall. The door to the first floor apartment was open; Detective Rooney looked into the apartment to make sure no one else was present who would pose a danger to the officers. When he did so, he saw a table on which a quantity of narcotics was sitting. It is those narcotics, which Rooney observed from the hallway, that form the basis of the charges lodged against Gomez and Nunez.
Rooney also testified that Detective Formentin had indeed used a battering ram, as Bailey had testified earlier, but that he had used the ram on the door of the second floor apartment, for which the warrant had been issued, not the rear entry door as Bailey had described. There was no one present in the second floor apartment when the officers forced the door. They searched the apartment but did not recover any narcotics.
Detective Rodriguez also testified in connection with the motion to suppress. He was the first officer to enter the building. He testified that the rear door was "wide open" and he "walked right through."
After hearing these varied descriptions, the trial court rejected Rodriguez's testimony that the back door was wide open as not credible but accepted as credible Rooney's testimony that the back door was unlocked but had to be pushed open to allow the police to enter. These credibility determinations and factual findings are, of course, entitled to substantial deference on appeal. State v. Locurto, 157 N.J. 463, *583 471, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). The trial court concluded that Detective Bailey's testimony that Detective Formentin had used a battering ram to breach the back door was simply the result of a mistake in communications between the two men. Finally, the trial court determined that it was immaterial whether the rear door was closed or ajar because, in the trial court's view, the police were obligated to knock and announce their presence before proceeding into the building to execute the warrant. In the view of the trial court, the failure of the police to knock on the unlocked outer door before physically entering the building was fatal to the recovery of the narcotics from the first floor apartment, which Rooney had observed while in the first floor hallway.
At the conclusion of testimony, and after argument, the trial court gave an oral opinion setting forth its reasons. After review of briefs filed with this court, the trial court issued a supplemental letter opinion in which it amplified its views.
In its oral opinion, the trial court relied on Tatman v. State, 320 A.2d 750 (Del. 1974) to support its conclusion that the officers were required to knock on the rear door of this building before entering. We consider the trial court's reading of Tatman too broad. In that case, the police had a search warrant for a second floor apartment. They arrived at the building at approximately 6:00 a.m.; they knocked at the locked front door and, after approximately five seconds, forced the door open. They then went to defendant's apartment, battered down the door and entered with guns drawn. Defendant and a companion were asleep. It was in that context that the court concluded that the knock on the building's outer door was ineffective because it failed to provide any realistic potential of notifying the occupants of the apartment of police presence. The court concluded that, in consequence, the police were required to knock again on the door of defendant's apartment before entering; it was the failure of the police to do so that led to the court suppressing the evidence recovered from that apartment.
In its supplemental letter opinion, the trial court cited several additional cases as authority to support its ruling that the police had to knock before walking through the unlocked rear door to this building: United States v. Fluker, 543 F.2d 709 (9th Cir.1976); People v. Trull, 64 Ill.App.3d 385, 20 Ill.Dec. 960, 380 N.E.2d 1169 (1978); People v. Killebrew, 76 Mich.App. 215, 256 N.W.2d 581 (1977) and State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805 (1999). As with Tatman, supra, we consider the trial court's reading of these cases to be too broad.
In Fluker, supra, 543 F.2d at 712, the police had a warrant to search the apartment of Willard Young, located in the basement of 1127 East 15th Street in Anchorage, Alaska. The building had two levels, a street level, on which the landlord lived, and a basement level, which had two apartments, one of which was Fluker's and one of which was Young's. The two basement apartments could be reached through a side door, which led into a small corridor which only provided access to the two basement apartments. The police forced the side entry door and entered the corridor; the door to Young's apartment was partially open. The police announced themselves and placed Young and another occupant under arrest. A search turned up a quantity of narcotics. Fluker, in the adjoining apartment, heard the disturbance and tossed a quantity of narcotics out his window, where they were retrieved by other agents who had been detailed to secure the perimeter of the building. Ibid. The two were indicted together and both moved to suppress the narcotics retrieved from their respective apartments. The Court of Appeals concluded that the failure of the agents to knock on the side entry door violated 18 U.S.C. § 3109 and required suppression of the narcotics seized in Young's apartment. Id. at 717. When it turned to defendant Fluker, however, *584 the court disregarded the failure to knock on the outer door; it concluded that because the officers who saw Fluker toss out the drugs were on the premises to execute a valid search warrant, there was no violation of his Fourth Amendment rights. Id. at 718.
We do not consider Fluker dispositive. Its analysis is wholly statutory, without consideration and discussion of the reasonableness standard which generally infuses and guides any consideration of Fourth Amendment issues. State v. Bilancio, 318 N.J.Super. 408, 413, 724 A.2d 278 (App. Div.), certif. denied, 160 N.J. 478, 734 A.2d 793 (1999). Further, the record in Fluker clearly established that the occupants of the building regularly and routinely kept the side door locked. Supra, 543 F.2d at 712, 716. Here, however, the rear door was unlocked and the record is wholly silent about whether the residents of 103 Mill Street routinely locked this door, did so only sporadically or entirely failed to do so. Speculation that the incidence of crime in the surrounding area would probably lead the residents to keep the door locked cannot substitute for proof on the question. In addition, the side door utilized by the agents in Fluker provided access to those two apartments only. Ibid. In the instant case, each apartment in the building could be reached no matter which door was utilized.
Further, the Ninth Circuit has, in recent years, declined to extend its holding in Fluker. For example, in United States v. Nohara, 3 F.3d 1239, 1241 (9th Cir.1993), the court held that a tenant does not have a reasonable expectation of privacy in the hallway of his apartment building; it thus denied defendant's motion to suppress contraband an agent could view from the hallway after defendant opened the door to his apartment. The court in Nohara did not have occasion to consider the question of entry through an unlocked outer door. The agent in that case gained access to the building when he accompanied an informer, who defendant admitted to the building.
The other cases cited by the trial court are similarly unavailing. In Ortiz, supra, 600 N.W.2d at 817, the Nebraska Supreme Court held that the use by police of a dog specially trained to detect the scent of narcotics to sniff defendant's apartment from the hallway was a search which violated defendant's reasonable expectation of privacy. The case is silent on how the police entered the building in the first instance.
In Trull, supra, 20 Ill.Dec. 960, 380 N.E.2d at 1170, the court concluded the police could not use keys found at the scene of a burglary to open a locked door to an apartment building and then enter the common areas and hallways. In the course of its opinion, however, the court noted, "We discern a marked difference between an individual's expectation of privacy in a locked apartment building as compared to an unlocked one." Id. at 1173.
Finally, the court in Killebrew, supra, was not called upon to consider whether the police must knock before entering through an unlocked door and the case is thus factually inapposite.
We recognize that the authorities in this area are not uniform. Professor LeFave indicates that entry through an unlocked door does not "pass muster under the Fourth Amendment." 2 LaFave, Search and Seizure, § 4.8(b) (3d ed.1996). None of the cases he cites for that proposition, however, involved entering the hallway of a multi-family building through an unlocked entry door. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L. Ed.2d 828 (1968) (entering an unlocked door to the particular apartment in question); Ex parte Gannaway, 448 So.2d 413 (Ala.1984) (single-family home); Duke v. Superior Court, 1 Cal.3d 314, 82 Cal.Rptr. 348, 461 P.2d 628 (1969) (single-family home); People v. Gifford, 782 P.2d 795 (Colo.1989) (single-family home); Erickson v. State, 597 P.2d 344 (Okla.Crim.App. *585 1979) (single-family home); Commonwealth v. DeMichel, 442 Pa. 553, 277 A.2d 159 (1971) (single-family home); State v. Miller, 7 Wash.App. 414, 499 P. 2d 241 (1972) (single-family home). He notes, moreover, "This is not to suggest that under every circumstance in which a door is opened before the notice requirements are completed it is necessary to conclude that the Fourth Amendment has been violated." LaFave, supra, at § 4.8(b).
Other courts have determined that entry through an unlocked door into a common area does not first require the police to knock. United States v. Acosta, 965 F.2d 1248 (3d Cir.1992) (defendants' Fourth Amendment interests did not extend to the hallway of their apartment building and entry into the building through an unlocked door did not violate their Fourth Amendment privacy rights); United States v. Concepcion, 742 F.Supp. 503 (N.D.Ill. 1990), aff'd, 942 F.2d 1170 (7th Cir.1991) ("the better reasoned decisions are that searches of common areas of secured apartment buildings do not violate the tenants' legitimate expectations of privacy"); United States v. Perkins, 286 F.Supp. 259 (D.D.C.1968), aff'd, 432 F.2d 612 (D.C.Cir.), cert. denied, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970) (police not required to knock and announce at unlocked front door before entering threestory rooming house).
We are satisfied that the reasonableness of the officers' entry into this building should be tested against the policies which undergird the common law's adoption of the "knock and announce" rule. Looney v. City of Wilmington, Del., 723 F.Supp. 1025, 1030 (D.Del.1989). "Assessment of these purposes in the context of a particular case is a useful way to determine whether the entry in that case violated the Fourth Amendment." LaFave, supra, § 4.8(a).
The purposes of the rule are three-fold: to reduce the risk of violence that inheres in an unannounced forced entry; to protect privacy by reducing the risk of entering the wrong premises; and to prevent physical damage to the property. State v. Bilancio, supra, 318 N.J.Super. at 417-18, 724 A.2d 278; LaFave, supra, § 4.8(a). Here the warrant was limited to the second floor apartment but that apartment was, in fact, empty when the police arrived to conduct their search. Although the reasonableness of the officers' actions has to be evaluated as of the time they opened the unlocked rear entry door, Richards v. Wisconsin, 520 U.S. 385, 395, 117 S.Ct. 1416, 1422, 137 L.Ed.2d 615 (1997), the purposes of the knock and announce rule would not be advanced by invalidating their opening of this unlocked door, for Gomez and Almonte, who were not in the apartment which was the object of the warrant but rather standing in the first floor hallway, were not affected by the omission. We have recognized that the police need not knock before entering an unoccupied structure for such an act would be futile. Bilancio, supra, 318 N.J.Super. at 418, 724 A.2d 278.
Defendants have stressed, and the trial court noted, that the building in question is quite small and we recognize that it is conceivable that if the police had knocked on the rear door, the sound of the knock might have been heard by someone else in the building. We decline, however, to posit our analysis on the physical dimensions of the structure for we are convinced that such an approach is ultimately unworkable. We consider the fact of whether a door is locked or unlocked a far more reliable predictor of a reasonable expectation of privacy than the size of the building in which one resides.
The trial court, in its supplemental letter opinion, noted that it had concluded that this building is not an apartment house but a three-family dwelling. We do not perceive that to be a significant distinction based on the record that was developed in this matter; whether a particular transaction invokes the Fourth Amendment should not depend upon which label is selected.
*586 We are satisfied that the record developed at the motion to suppress would not support a finding that both doors to this building were routinely locked and that no one was permitted to enter without the assent of a resident. We conclude that the police, who found the rear door unlocked, were under no obligation to knock before proceeding further into this multi-family building.
Reversed and remanded for further proceedings.