KOBLITZ, J.A.D.
*963 *29 Defendants appeal from an August 7, 2014 order denying their motion to suppress evidence as well as their subsequent February 19, 2016 convictions after pleading guilty to various crimes based on the drugs and guns found in plain view through the open door of an apartment.[1] The police used a tool to force entry into the locked apartment building twice before approaching the fourth-floor apartment door. The State, conceding a lack of probable cause, successfully argued that the forced entry into the building did not violate constitutional protections. The motion judge allowed defendants to continue on bail pending this appeal. Because people have a reasonable expectation of privacy from a forced police entry into the locked common area of the apartment building, we now reverse.
The suppression hearing revealed the following facts, as found by the judge. On May 8, 2013, close to 1:00 a.m., Fort Lee Patrolman Richard Hernandez, an experienced K-9 officer who had been on the force since 2003, noticed a Nissan Sentra with Pennsylvania license plates driving slowly with its hazard lights on. When the car pulled over and stopped, Patrolman Hernandez pulled alongside the car to make sure the driver was all right. Jose Rivas, the driver, began to explain in broken English that he had a *30 flat tire. Rivas exited his car and moved toward the trunk. Patrolman Hernandez, fluent in Spanish, exited his patrol car.
Rivas said he had a spare tire but not the necessary tools to change the tire. He asked Patrolman Hernandez if he had a tire iron. Rivas opened the trunk to show Patrolman Hernandez the spare tire. In the trunk, Patrolman Hernandez saw a mirror and a headlight, with wires hanging out, which did not appear to belong to the Sentra.
Patrolman Hernandez asked Rivas where he came from and what he was doing in the area. Rivas answered that he was from the Bronx, although he had a Pennsylvania driver's license. He said his cousin lived in Pennsylvania, and that he was visiting a friend named "Shorty" who lived at a nearby five-story building with thirty-six apartments. Patrolman Hernandez observed that Rivas avoided eye contact, paused before answering some questions and was sweating although it was sixty degrees outside. His hands shook and the artery in his neck pulsed.
Believing that Rivas was acting evasively and nervously, Patrolman Hernandez called for back-up and activated the video camera in his patrol car; Officer Cabrera and Detective Porto arrived.
Rivas said that his friend Shorty lived in Apartment 4G. Patrolman Hernandez went to the building, leaving Rivas with the two officers outside. The outside door to the building was open, but the second, interior door was locked. Patrolman Hernandez pushed the intercom button for Apartment *964 4G but no one answered. He tried to find a listing for a superintendent, but there was none. He returned to his patrol car to find a "slim jim," which he described as an "entry tool." Patrolman Hernandez then returned to the building, slid the slim jim between the door frame and bolt, and entered forcibly.
Patrolman Hernandez then went to Apartment 4G, knocked on the door, and spoke to a female resident, who denied knowing Rivas. Patrolman Hernandez returned downstairs and accused Rivas of lying, saying, "[I]f we don't speak to [your friend] now *31 there is going to be a problem." Rivas said he was mistaken about the apartment number; it was actually Apartment 4C. Upon the officer's request, Rivas agreed to accompany Patrolman Hernandez and another officer into the building. Patrolman Hernandez again forced his way in with the slim jim and went to Apartment 4C.
Rivas knocked on Apartment 4C, but no one answered. Patrolman Hernandez asked Rivas to call Shorty; when he did, Patrolman Hernandez could hear a male voice coming from Apartment 4A. Rivas told the man he had a flat tire, and that he was downstairs. The man inside Apartment 4A said he would come down. The door to Apartment 4A opened and defendant Perez-Garcia stepped out. Inside the apartment, Patrolman Hernandez saw defendant Sencion seated on a couch next to a large gallon-size Ziploc bag filled with hundreds of blue folds. Patrolman Hernandez saw glassine envelopes containing a tan and off-white powdery substance which he believed was heroin.
Defendants Jerez and Santana were seated at the kitchen table where a mirror was located. The apartment was secured until officers returned with a warrant to search the apartment. Heroin, marijuana, drug paraphernalia, and two handguns were seized and secured as evidence.
"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.' " State v. Boone, 232 N.J. 417, 425-26, 180 A.3d 1110 (2017) (quoting State v. Scriven, 226 N.J. 20, 40, 140 A.3d 535 (2016) ). We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.' " State v. Gamble, 218 N.J. 412, 424-25, 95 A.3d 188 (2014) (quoting State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964) ). We owe no deference, however, to conclusions of law made by trial courts in suppression *32 decisions, which we instead review de novo. State v. Watts, 223 N.J. 503, 516, 126 A.3d 1216 (2015).
Defendants argue that the forced entry by police into the locked apartment building on two occasions was unconstitutional and that any and all evidence seized from the apartment must be suppressed as fruit of the poisonous tree. State v. Shaw, 213 N.J. 398, 421, 64 A.3d 499 (2012). The State bears the burden of justifying a warrantless search or seizure. State v. Bolte, 115 N.J. 579, 585, 560 A.2d 644 (1989).
The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution require that police officers obtain a warrant before conducting a search, unless that search falls into a recognized exception to the warrant requirement. State v. Deluca, 168 N.J. 626, 631-32, 775 A.2d 1284 (2001) ; see State v. Pena-Flores, 198 N.J. 6, 11, 965 A.2d 114 (2009) ("Those exceptions include, among others, plain view, consent, search incident to arrest, *965 and the automobile exception."). Federal courts have employed a two-prong test: first, a person must have exhibited an actual expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable or legitimate. Minnesota v. Olson, 495 U.S. 91, 93, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Our Supreme Court, however, has defined an objective test asking only whether a person has a reasonable expectation of privacy. State v. Hempele, 120 N.J. 182, 199-200, 576 A.2d 793 (1990).
Even when strangers have access to the location, an expectation of privacy may well exist under the New Jersey Constitution. See id. at 211, 576 A.2d 793 (holding that, despite federal law to the contrary, police officers must have a valid search warrant to open a garbage bag); see also State v. Stott, 171 N.J. 343, 369, 794 A.2d 120 (2002) (determining that an involuntarily-committed psychiatric patient had a reasonable expectation of privacy in his shared state hospital room).
*33 In 2010, we determined that the common hallway of a two-family house was not open to the public. State v. Jefferson, 413 N.J. Super. 344, 354, 994 A.2d 1067 (App. Div. 2010). We found that a tip gave the police a rational basis to begin an investigation of the defendant, but did not amount to probable cause to forcibly enter the multi-unit home. Id. at 360, 994 A.2d 1067. Police were not privileged to enter that hallway without a warrant or an exception to the warrant requirement. Ibid.; see also State v. Lewis, 116 N.J. 477, 479-81, 561 A.2d 1153 (1989) (suppressing evidence because the plain view of drugs occurred after the officer, acting on a tip but without a warrant, put his foot in the doorway to prevent the defendant from closing it).
The State highlights that the locked common hallway in Jefferson was in a two-dwelling home, 413 N.J. Super. at 354, 994 A.2d 1067, whereas here Patrolman Hernandez entered a five-story apartment building with thirty-six apartments.
The State quotes one sentence in an Eleventh Circuit opinion, United States v. Miravalles, 280 F.3d 1328, 1332 (11th Cir. 2002) : "The more units in the apartment building, the larger the number of tenants and visitors, workers, delivery people, and others who will have regular access to the common areas, and the less reasonable any expectation of privacy." The opinion, however, goes on to state: "Whether the door to the building is locked is another relevant consideration." Id. at 1332. With respect to the entry door of a building containing three apartment units, one on each floor, we considered "the fact of whether a door is locked or unlocked a far more reliable predictor of a reasonable expectation of privacy than the size of the building in which one resides." State v. Nunez, 333 N.J. Super. 42, 51, 754 A.2d 581 (App. Div. 2000).
Contrary to the State's assertion, our Supreme Court's decision in Johnson does not militate against the expectation of privacy in a locked entryway. State v. Johnson, 171 N.J. 192, 209, 793 A.2d 619 (2002). In discussing whether the plain view doctrine applied to a police officer's seizure of drugs placed by that defendant "into a hole beside a post on the porch of a multi-family dwelling," the *34 Court noted, "the porch involved in this case, although part of the curtilage, has a diminished expectation of privacy." Id. at 199, 209, 793 A.2d 619. The Johnson Court did not dispose of the case on the basis that the defendant had no reasonable expectation of privacy, but rather held "that the conduct of the police in seizing the clear plastic bag from the hole was reasonable under the plain view doctrine and violated neither the Federal nor the New Jersey Constitution." *966 Id. at 220, 793 A.2d 619. Based on this rationale our Supreme Court in Johnson found no expectation of privacy in an unlocked route of access to a residence. Id. at 209, 793 A.2d 619.
In State v. Penalber, 386 N.J. Super. 1, 4, 898 A.2d 538 (App. Div. 2006), we invalidated a police entry into an open apartment door for the rationale delineated in State v. De La Paz, 337 N.J. Super. 181, 196, 766 A.2d 820 (App. Div. 2001) : investigations do not justify home entries without a warrant. We stated, "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Penalber, 386 N.J. Super. at 11, 898 A.2d 538. Police are permitted to enter locked common areas with permission, or enter an open and unlocked door leading to a vacant building. State v. Perry, 124 N.J. 128, 133, 590 A.2d 624 (1991) ; State v. Pante, 325 N.J. Super. 336, 342, 739 A.2d 433 (App. Div. 1999) ; State v. Brown, 282 N.J. Super. 538, 548, 660 A.2d 1221 (App. Div. 1995). Thus, the entry into a locked common hallway without permission is a violation of the occupants' reasonable expectation of privacy.
We must also review the unusual facts of this case in light of the purposes of the exclusionary rule.
The exclusionary rule generally bars the State from introducing evidence of the "fruits" of an illegal search or seizure. The rule serves a number of important purposes: to deter misconduct by the police and thereby guarantee the protections provided by the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution to ensure that police do not "profit" from lawless behavior, and to preserve the integrity of the courts by not providing a forum for tainted evidence.
[ State v. Herrerra, 211 N.J. 308, 330, 48 A.3d 1009 (2012) (citations omitted).]
*35 N.J.S.A. 2C:18-3 states, "A person commits a petty disorderly persons offense if ... he enters ... in any place as to which notice against trespass is given by ... [f]encing or other enclosure manifestly designed to exclude intruders." Illegal activity by the police, such as what occurred here that arguably constituted criminal trespass, should be strongly discouraged. "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. ... If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." State v. Novembrino, 105 N.J. 95, 101, 519 A.2d 820 (1987) (quoting Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (quoting Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) ) ).
When seeking to enter the locked entryway to an apartment building, many individuals might legitimately give an officer permission to enter, including any resident of the building or the superintendent.[2] Here, the police twice entered through a locked door of an apartment building using a tool specifically intended for forced entries. The experienced officer testified he had forcibly entered buildings in that manner at least twenty times before.
*967 Seemingly aware of the impropriety of this method of investigation, the officer did not include his mode of entry in his initial police report. Only after an assistant prosecutor spoke to him six months later did Patrolman Hernandez prepare a supplemental report, acknowledging one forced entry but omitting that he had done so twice. The State concedes a lack of probable cause and thus the futility of seeking a warrant, but justifies the break-ins as being no more intrusive than walking onto a porch after observing *36 a defendant hide drugs. See Johnson, 171 N.J. at 220, 793 A.2d 619.
We accept that the police may carry a slim jim, or as the assistant prosecutor once referred to it, a "burglary tool," see N.J.S.A. 2C:5-5(a), to assist someone who is inadvertently locked out. We cannot condone the police forcing entry into a locked residential apartment building while on an investigative hunt for suspected criminal activity. Any evidence found after such an invasion of privacy must be suppressed.
Reversed. We remand for further proceedings consistent with this opinion and do not retain jurisdiction.

We consolidate these four appeals for the purpose of writing one opinion. Juan Santana and William Jerez pled guilty to first-degree possession of heroin with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(1). Santana was sentenced to eight years in prison with a forty-eight month period of parole ineligibility. Jerez was sentenced to six years in prison with a twenty-four month period of parole ineligibility. Yomaira Sencion and Roberto Perez-Garcia pled guilty to second-degree conspiracy to possess heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(1), and were each sentenced to three years in prison. We have received no information regarding the resolution of the case against Jose Rivas, who was indicted with the other four defendants.

The officer testified he looked for the superintendent, who was not listed as a tenant. But cf N.J.A.C. 5:10-11.1(d) ("Unless either the owner or the janitor resides on the premises, the owner of a multiple dwelling or his managing agent in control shall post and maintain in such dwelling a legible sign, conspicuously displayed, containing the janitor's name, address (including apartment number) and telephone number.").