NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2490-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LOUIS V. WILLIAMS,

      Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**August 19, 2019**

**APPELLATE DIVISION**

Submitted January 15, 2019 – Decided August 19, 2019

Before Judges Rothstadt, Gilson and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 16-11-0834.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele Erica Friedman, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Valeria Dominguez, Deputy Attorney General, of counsel and on the brief).

    The opinion of the court was delivered by

NATALI, J.S.C. (temporarily assigned).

The central issue in this appeal is whether a resident of a boarding or rooming house has a reasonable expectation of privacy in areas beyond his or her bedroom door. Following an unsuccessful motion to suppress marijuana and a firearm seized from his room, defendant Louis V. Williams pled guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). Related possessory weapons charges and a disorderly-persons charge of possessing less than fifty grams of marijuana, N.J.S.A. 2C:35-10(a)(4), were dismissed.[1] Defendant was sentenced to five years of imprisonment with forty-two months of parole ineligibility, and now appeals from the order denying his motion to suppress. Based on the proofs elicited at the suppression hearing, we conclude defendant had a reasonable expectation of privacy in the common areas of his residence, and it was unreasonable for the police to enter the premises repeatedly without a warrant, exigent circumstances, or a lawful right of entry. Accordingly, we reverse.

I.

The following facts are gleaned from the suppression hearing, where a single witness, Detective Carlos Estevez of the New Jersey State Police,

---

[1] A second-degree charge of certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1), was amended to the possessory weapons offense to which defendant pled guilty.

testified. The motion judge found that Estevez "portrayed candor," "bore an honest demeanor," and that his testimony was "credible."

At around 9:30 a.m. on March 19, 2016, Estevez was in his office in Trenton when he heard gunshots from a nearby neighborhood. After checking the immediate vicinity on foot, he entered a police vehicle with his superior, Sergeant Sansone.[2] Dispatch reports from the Trenton Police Department indicated that the gunshots were fired at a nearby bar, and that the suspected shooter was an African-American male named "Louis" with an alias of "Big" who was wearing a grey hooded sweatshirt and who had fled to, and lived at, a dwelling on Spring Street.

The officers drove to the Spring Street dwelling, where they met a Trenton Police Department officer outside. Estevez testified that from the vantage point of the sidewalk, the structure appeared to be an "attached row home" that "could be" a "normal single family home" or a "multi" family home because "[t]here [were] two floors." Estevez could not "tell [if it was] a boarding house" from the sidewalk, but testified that "other boarding houses" he observed in Trenton had similar external appearances. According to Estevez, the front door was equipped with a lock, but the door was unlocked at

---

[2] Sergeant Sansone's first name is not provided in the record.

that time and "wasn't secured at all, not by [a] latch, not by [a] doorknob, not by [a] lock," and it simply "swung open" when he knocked on it.[3]

When the door opened, the three officers "converged" into what Estevez described as a long hallway with a stairway leading to the second floor directly in front of him. Estevez noticed multiple doors to his left, all of which had padlocks on them, which led him to believe the building was being used as "a boarding house because usually boarding houses are multi-apartment dwellings." The officers then "cleared the common area[s]" for weapons and to "make sure" that the suspect was not "hiding . . . in that house unlawfully." The "common areas" the officers searched included the downstairs hallway, "a common bathroom" upstairs, and "a short hallway" by the bathroom.

After clearing the common areas, Estevez and Sansone left the building and returned to their vehicle to search for the suspect in the surrounding area. During that "loop" around the area, the Trenton Police Department officer left the building, and Estevez and Sansone received a police dispatch report

---

[3] At the suppression hearing, Estevez stated that he did not remember whether there was "a screen door" in front of "the main door." We note, however, that the record contains an affidavit in support of a search warrant, see infra p. 7, which was marked for identification but not entered into evidence, in which Estevez certified that the building had "a white storm dorm with clear glass in the middle" and a "front door" that was "white with a small half-moon window on the top of it." The affidavit also states that "[t]o the left of the front door" is a black mailbox underneath the street number assigned to the house.

indicating that a crime scene was established at the bar and that "spent shell cases" were recovered, which Estevez interpreted as confirming his belief that "a gun was discharged" and "there was an actual shooting." Estevez also testified that he believed he was involved in an "active shooting" investigation.

Estevez and Sansone returned to Spring Street and re-entered the building. Estevez proceeded to knock on two interior doors, one on the first floor and one on the second floor, both of which were answered by female residents who denied having any male roommates. Estevez then went to the second floor's "middle room door."

As he approached that room, Estevez heard movement and smelled marijuana through the door, which he did not notice the first time he entered the dwelling. Estevez knocked on the door, announced that he was a police officer, and "told the individual to go ahead and answer the door."

Defendant, who was unknown to Estevez at the time, opened the door shirtless but wearing pants. The door swung inward toward a room that Estevez stated was approximately eight feet by eight feet. According to Estevez, the smell of marijuana "drastically increased" when defendant opened the door, and defendant was sweating and breathing heavily as if "he just did some type of exercise." Estevez also stated that, based on his experience in

5

shooting investigations, he knew that individuals tend to remove their shirts to avoid identification, and that his suspicions were heightened because:

> [Defendant was] sweating. It's . . . early in the morning in March, still cold out. That didn't make sense to me. And then he was . . . breathing heavy. So at this point I asked him why and he told me he just woke up. So, again, the hairs on the back of my neck are standing up, something's not right, something's not fitting here. And not to mention, the odor of the burnt ember marijuana at this point is coming out of the room.

Estevez stated that while he was standing in "the doorway," which he clarified to mean "the common hallway area," he looked into defendant's "single bedroom" and observed "a mattress on the floor," a "window on the rear wall," a "dresser" by the window, and "objects scattered around." Estevez informed defendant that he was conducting an investigation and asked defendant to provide identification. Defendant responded by stating that he "had to go get his wallet." As Estevez explained:

> [Defendant] then walked towards the dresser on the left side of the room, [and] went to grab the wallet. And at that point, -- now, again, this is a shooting investigation. I'm all over his hands. I'm watching his hands closely, you know, for officer safety. It's small quarters. He goes to the back of the room. I'm watching his hands as he grabs his wallet. I see this small bag of marijuana right next to his wallet.

6

Estevez testified that from his vantage point the marijuana was "in front of the wallet" on the dresser, and that once he saw the marijuana, he knew that defendant was "going to be under arrest."

As defendant grabbed his wallet and "turn[ed] around to provide . . . the identification," Estevez simultaneously "stepp[ed] into the apartment . . . to effectuate the arrest." According to Estevez, he and defendant:

> met right there in the room. [It was] a matter of a couple of steps and, again, it's close quarters, close proximity. I want to make sure I have control for my safety, for his safety, [and] the safety of the other officer.

Defendant handed his wallet and driver's license to Estevez, who noticed defendant's name was Louis Williams. Estevez testified that at that point, "everything[] [was] starting to match up." He then placed defendant under arrest for possession of marijuana, conducted a protective sweep of the bedroom, and applied for a warrant to search defendant's room for drugs, weapons, and other items. After obtaining the warrant, other police officers searched defendant's bedroom and seized a bag of marijuana and a "Lorcin .25 caliber semi-automatic handgun with a defaced serial number."

The court reserved decision at the conclusion of the suppression hearing. In its subsequent oral opinion, the court explained that it accepted Estevez's testimony "as fact." Based on that testimony, the court found that "the exterior

A-2490-17T4

door" of the Spring Street dwelling "was not secured," that when Estevez knocked on it, "it swung open," and that the dwelling was being used as a boarding house.[4] The court determined that the constitutional protections against unreasonable searches and seizures "only extend to such areas . . . in which an individual has a reasonable expectation of privacy," and that those safeguards did not extend to "the building in general" or "the common areas" because "those areas are accessible and used by other occupants."

After finding "defendant did not have any privacy right to that common hallway of the boarding house," the court concluded that the officers' actions "were objectively reasonable as they had a lawful right to be at that location where they saw contraband in plain view," and Estevez inadvertently observed the marijuana. Therefore, the court held that "there was no unlawful search or seizure prior to the application for a search warrant," and that "all of the information obtained provided a legitimate basis for Estevez to apply for and

---

[4] With certain exceptions not relevant here, a boarding house is defined as "any building . . . which contains two or more units of dwelling space arranged or intended for single room occupancy . . . wherein personal or financial services are provided to the residents . . . ." N.J.S.A. 55:13B-3(a). Contrariwise, N.J.S.A. 55:13B-3(h) defines "[r]ooming house" as "a boarding house wherein no personal or financial services are provided to the residents." Aside from Estevez's testimony that the "attached row home" was a "boarding house," the record does not contain evidence indicating whether personal or financial services were provided to the residents of the Spring Street dwelling. For purposes of our decision, we discern no substantive distinction in characterizing the Spring Street residence as a rooming or boarding house.

obtain a search warrant for the premises." Accordingly, the court denied defendant's motion to suppress.

Defendant raises the following issue on appeal:

POINT I

THE OFFICERS' WARRANTLESS ENTRY INTO THE BUILDING WITH A LOCK ON ITS FRONT DOOR WAS OBJECTIVELY UNREASONABLE.

II.

"An appellate court reviewing a motion to suppress evidence . . . must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Sencion, 454 N.J. Super. 25, 31 (App. Div. 2018) (quoting State v. Boone, 232 N.J. 417, 425-26 (2017)). We defer to the motion judge's factual findings when supported by sufficient evidence in the record "because the motion judge, unlike an appellate court, has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gonzalez, 227 N.J. 77, 101 (2016) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We also defer to the court's credibility findings. State v. Locurto, 157 N.J. 463, 472 (1999). "We owe no deference, however, to conclusions of law made by trial courts in suppression decisions, which we instead review de novo." Sencion, 454 N.J. Super. at 31-32.

Defendant maintains that "the officers' warrantless entry [into] the building was unconstitutional at its inception" and the evidence discovered "must be suppressed as fruit of the poisonous tree."  Citing Sencion and State v. Jefferson, 413 N.J. Super. 344 (App. Div. 2010), defendant argues that he "had a reasonable expectation of privacy in [the] common hallways" and the officers violated his federal and state constitutional rights when they made a warrantless entry into the building.

The State, principally relying on State v. Smith, 37 N.J. 481 (1962), and a series of federal cases, contends that the police action here was constitutional because the officers "had a lawful right to be in the common areas without a warrant while conducting their investigation of the shooting" and "defendant had no reasonable expectation of privacy in the common hallway of the unlocked multi-unit building."  According to the State, once the police were in a "lawful vantage point of the common hallway," they observed the marijuana "in plain view on defendant's dresser," and subsequently obtained a lawful warrant that led to the discovery and seizure of the gun.

### III.

"The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution require that police officers obtain a warrant before conducting a search, unless that search falls into a recognized

exception to the warrant requirement." Sencion, 454 N.J. Super. at 32. Further, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." State v. Penalber, 386 N.J. Super. 1, 11 (App. Div. 2006) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)).

"A search without a warrant is presumptively invalid," State v. Mann, 203 N.J. 328, 340 (2010), and "the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Elders, 192 N.J. 224, 246 (2007) (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)). One exception is the plain view doctrine.[5] Sencion, 454 N.J. Super. at 32 (quoting State v. Pena-Flores, 198 N.J. 6, 11 (2009)). Probable cause is necessary to invoke the plain view doctrine, State v. Johnson, 171 N.J. 192, 208 (2002) (quoting Arizona v. Hicks, 480 U.S. 321, 327 (1987)), which is "a 'well grounded' suspicion that a crime has been or is being committed." Id. at 214 (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)).

In order to satisfy the plain view doctrine when this case was decided, the State was required to establish: 1) a police officer was "lawfully in the

---

[5] Other than the plain view doctrine, the State does not allege on appeal that any other exception to the warrant requirement applied, such as the community caretaker doctrine or exigent circumstances.

viewing area"; 2) the officer "discover[ed] the evidence 'inadvertently'"; and 3) it was "'immediately apparent' to the police that the items in plain view were evidence of a crime, contraband, or otherwise subject to seizure." Mann, 203 N.J. at 341 (quoting State v. Bruzzese, 94 N.J. 210, 236 (1983)).[6] "The question whether property in plain view of the police may be seized . . . must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." Johnson, 171 N.J. at 208 (alteration in original) (quoting Texas v. Brown, 460 U.S. 730, 737 (1983)).

The parties do not dispute that Estevez discovered the marijuana inadvertently once defendant opened his bedroom door, or that it was immediately apparent to Estevez that the marijuana was contraband subject to seizure. Accordingly, the issue on appeal is whether Estevez had a lawful right to be in the second floor hallway where he initially smelled the marijuana that led to his observations, defendant's arrest, and the issuance of the warrant prompting the seizure of the defaced gun. In deciding if Estevez was lawfully in that viewing area, we must determine whether defendant had a reasonable expectation of privacy in the common hallway, such that he is entitled to the

---

[6] The New Jersey Supreme Court eliminated the inadvertence prong in November 2016. Gonzales, 227 N.J. at 82. "That prong is satisfied if the police did not 'know in advance the location of the evidence and intend to seize it . . . .'" Johnson, 171 N.J. at 211 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 470 (1971)).

protections of the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.

"One seeking to invoke the protection of the [F]ourth [A]mendment must establish that a reasonable expectation of privacy was invaded by government action." State v. Marshall, 123 N.J. 1, 66 (1991). To determine whether an expectation of privacy is protectable, federal courts "employ[] a two-prong test: first, a person must have exhibited an actual expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable or legitimate." Sencion, 454 N.J. Super. at 32. "Our Supreme Court, however, has defined an objective test asking only whether a person has a reasonable expectation of privacy." Ibid. Such "'[e]xpectations of privacy are established by general social norms,' and must align with the 'aims of a free and open society.'" State v. Taylor, 440 N.J. Super. 515, 523 (App. Div. 2015) (quoting State v. Hempele, 120 N.J. 182, 200-01 (1990)).

Our courts have not squarely determined whether common areas in a rooming or boarding house are within the zone of privacy protected by the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution.[7]

---

[7] The cases that most nearly address this issue are State v. Ball, 219 N.J. Super. 501 (App. Div. 1987), and State v. Berlow, 284 N.J. Super. 356 (Law Div. 1995). But in Ball, the question was whether the defendant had a reasonable expectation of privacy in the unenclosed area behind a boarding house where

(continued)

Instead, our case law has focused primarily on multi-family apartment buildings.[8]

In discussing a resident's expectation of privacy in an apartment building, we observed that our "Supreme Court has indicated that generally in 'multi-occupancy premises . . . none of the occupants can have a reasonable expectation of privacy in areas that are also used by other occupants.'" Penalber, 386 N.J. Super. at 10 (quoting Johnson, 171 N.J. at 209). The Penalber court also noted, as the State does here, that a number of federal cases permit the police to make warrantless entry into a hallway of an apartment house "because a tenant can have no reasonable expectation of privacy in an area frequented by occupants of the other apartment unit, the

_____

(continued)
his pickup truck was parked. See Ball, 219 N.J. Super. at 506-07. In that context, we stated "[t]he curtilage concept has limited applicability with respect to such multi-occupancy premises because none of the occupants can have a reasonable expectation of privacy in the areas that are also used by other occupants." Ibid. And in Berlow, the trial court determined there was "insufficient evidence" to find that the defendant, who was the landlord of a rooming house, "had no right of privacy in the area to which police sought access," which was a "common area of a rooming house." Berlow, 284 N.J. Super. at 360.

[8] For example, in State v. Walker, 213 N.J. 281 (2013), the Court held that police officers "have a right to be . . . in the hallway of a public housing building," 213 N.J. at 296, specifically the hallway in front of defendant's "apartment" in a "public housing project in Newark." Id. at 285. There is no indication that the residence on Spring Street is a public housing building or in a public housing area of Trenton.

landlord, deliverymen and visitors." Ibid.  Other courts, however, have held that "occupants of an apartment house have a reasonable expectation of privacy in a common hallway, at least where the door leading into the hallway is kept locked."  Ibid.; see also Sencion, 454 N.J. Super. at 29-30, 32 (suppressing the fruits of a police search effectuated by the use of an "entry tool" because "people have a reasonable expectation of privacy from a forced police entry into the locked common area of the apartment building," but noting that "[e]ven when strangers have access to the location, an expectation of privacy may well exist under the New Jersey Constitution"); Jefferson, 413 N.J. Super. at 350-52 (holding that "the police entered defendant's home when [an officer] wedged herself in the doorway" of an apartment that was normally kept locked, but which the defendant briefly opened, "and that they needed either a warrant or an exception from the warrant requirement of the federal and State constitutions to do so"); State v. Nunez, 333 N.J. Super. 42, 51 (App. Div. 2000) ("[T]he fact of whether a door is locked or unlocked [is] a far more reliable predictor of a reasonable expectation of privacy than the size of the building in which one resides.").

Without distinguishing between apartment buildings and rooming or boarding houses, the State relies on several cases in asserting that "[a] policeman is not out-of-bounds when he is in the common passageway of a

multi-family house in the furtherance of an investigation."  See Smith, 37 N.J. at 496; see also Johnson, 171 N.J. at 209 ("[T]he curtilage concept has limited applicability with respect to multi-occupancy premises because none of the occupants can have a reasonable expectation of privacy in areas that are also used by other occupants" (quoting Ball, 219 N.J. Super. at 506-07)); State v. Brown, 282 N.J. Super. 538, 547 (App. Div. 1995) ("[A] tenant does not have a reasonable expectation of privacy in the common areas of a building merely because doors to the common areas are normally kept locked and require a key for access"); State v. Craft, 425 N.J. Super. 546, 550-52, 555 (App. Div. 2012).

In Smith, the defendant was "arrested in a flat occupied by [his] mother on the third floor of a three-family house" in Newark.  Smith, 37 N.J. at 490. The Court concluded that "the presence of the detectives at the door to the apartment itself involved no misconduct or invasion of the rights of anyone" because "[a]s to the owner, surely a policeman does not trespass when he enters the common areas in discharge of his duties," and as to the defendant's mother, who was a tenant, "it cannot be said that she was in possession of the passageway."  Id. at 496.  The Court reached a similar conclusion in finding a "diminished expectation of privacy" in the porch of "an attached row house with multiple apartments . . . ."  See Johnson, 171 N.J. at 200, 209-10.

But the motion judge in this case, despite referring to defendant's bedroom at one point as his "apartment," specifically found that the Spring Street dwelling was a "boarding house." Based on the facts elicited at the suppression hearing, we conclude the State failed to establish that Estevez was in a lawful viewing area when he observed the marijuana because defendant had a reasonable expectation of privacy in the common hallway of the boarding or rooming house, as that area was not proven to be clearly open to the public. We stress that our decision is limited to the specific facts of this case, and further conclude the cases cited by the State, which primarily address either curtilage, or common areas of apartment buildings or similar self-contained multi-unit dwellings, are of limited utility in resolving the issues on appeal. Those cases are factually and legally inapposite as the living arrangements at issue in those cases are dissimilar to defendant's boarding or rooming house, which Estevez described as resembling a single or multi-family home. This distinction is significant. Compare, e.g., United States v. Correa, 653 F.3d 187, 188 (3d Cir. 2011) (finding residents "of a multi-unit apartment building" had no "reasonable expectation of privacy in the building's common areas"), with Brown v. United States, 83 F.2d 383, 385-86 (3d Cir. 1936) (concluding that a "private dwelling in which the proprietress" lived with her family was the "home" of the "roomers" who also lived there, and that

17

"so far as the unlawful search" of the house "affected [the roomers], it violated their constitutional rights")

Indeed, several state and federal cases have held that hallways or other common areas in rooming or boarding houses are entitled to constitutional protections. See e.g., United States v. Booth, 455 A.2d 1351, 1353-54 (D.C. 1983) (rejecting the argument that residents of a rooming house "lack[ed] a legitimate expectation of privacy in the front hall where [the officer] made his warrantless entry"); State v. Titus, 707 So.2d 706 (Fla. 1998) (concluding residents of a rooming house had a reasonable expectation of privacy in the common areas); Logan v. Commonwealth, 616 S.E.2d 744, on reh'g en banc, 622 S.E.2d 771 (Va. Ct. App. 2005) (government conceded rooming house was not open to the public). We acknowledge, however, that a number of state and federal courts have reached a contrary conclusion. E.g., United States v. Anderson, 533 F.2d 1210 (D.C. Cir. 1976); State v. Kechrid, 822 S.W.2d 552 (Mo. Ct. App. 1992); State v. Smith, 154 A.3d 660, 666-67 (N.H. 2017) (finding roomers did not have a reasonable expectation of privacy in common areas because "the large number of tenants" in the rooming house, "the fact that each room had an individual number and a private lock, and [the roomers'] custom of leaving the exterior door unsecured" outweighed the fact that the roomers had a "shared kitchen and bathroom").

18

After reviewing the state and federal authorities, we are persuaded by the Florida Supreme Court's reasoning in Titus.  In that case, a police officer, without a warrant or consent, entered a side gate, then the back entrance of a two-story home that the officer knew was "a rooming house" to investigate an informant's tip that someone was smoking narcotics inside.  707 So.2d at 707. There was conflicting testimony as to whether the back entrance had a door, "but the residents kept their individual rooms locked," and "[t]he officer proceeded through a corridor to the common-area kitchen, where several people had gathered," some of whom were "neither residents nor guests thereof but who, according to unelaborated testimony, 'just came in off the street.'" Ibid.  After the officer observed defendant, who was a resident of the rooming house, place "a pipe into his pocket" and "an invited guest . . . smoking crack cocaine through a pipe," defendant was arrested and charged with possessory drug offenses.  Ibid.

In holding that defendant's motion to suppress the evidence obtained from the rooming house should have been granted, the court explained that the "mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents."  Id. at 708.  The court concluded that the sharing of the common hallway by the residents did not deprive them of a reasonable

expectation of privacy in that hallway or in the common areas connected by it. Id. at 708-11. Instead, in limiting its holding to the "common hallways" in rooming houses, the court distinguished "common hallways in unlocked apartment buildings, which generally serve only to connect separate, self-contained living units typically complete with all of the traditional living areas (i.e., bathrooms, dining rooms, living rooms, kitchens, etc.)." Id. at 711. The court explained,

> [i]nterior hallways in rooming houses are protected only by virtue of linking such traditional rooms within the house—they provide rooming house residents with the only means of access to these rooms, and are an inseparable feature of their "home." In other words, it is not any inherent nature of a hallway that controls, but rather what the hallway links (i.e. individual self-contained living units versus shared traditional living areas).
>
> [Ibid.]

Here, the court's decision that defendant enjoyed no expectation of privacy in the hallway was based primarily, if not exclusively, on the fact that the closed front door to the residential structure on Spring Street was unlocked around 10:00 a.m. on March 19, 2016, and, according to Estevez, was unsecured as the "force of [his] knock" caused it to open. From that fact alone, the court concluded that the common areas, which the police twice entered, and specifically the second floor hallway outside defendant's room, were open

to the public, thereby eviscerating defendant's privacy interest. We believe the court's conclusion is unsupported for the following reasons.

First, even if we ignore Estevez's certified statement in his warrant application that there were two, not one, closed front doors at the Spring Street dwelling, it is undisputed that the front door Estevez knocked on was closed, not open, and was equipped with a lock. The State elicited no facts at the suppression hearing to establish that the door was routinely left unlocked, that the public routinely entered the common areas, or that such an inference was reasonable based on any other evidence indicating the common area was open to the public. Cf. City of Evanston v. Hopkins, 71 N.E.2d 209 (Ill. App. Ct. 1947) (abstract) (upholding police entry into a rooming house where there was an open door and a "Public Telephone" sign at the entrance).

As for the State's claim that an unlocked front door renders any expectation of privacy unreasonable, in our view, the fact that the front door was not locked, like the doors in Jefferson and Sencion were, while relevant, is not dispositive. As noted, Estevez confirmed that the front door possessed a lock and was closed when he first approached it. In addition, the lack of proof that the communal areas were open to the public supports the conclusion that defendant had a reasonable expectation of privacy in the second floor hallway. Compare Berlow, 284 N.J. Super. at 360 (noting that "the mere description" of

21

certain premises as a "rooming house" does not establish the dwelling is open to the public) and Booth, 455 A.2d at 1354 (concluding that rooming house residents "had a legitimate expectation of privacy in the front hallway of the house they shared, which was not obviously a rooming house open to the general public") with Smith, 154 A.3d at 667 (finding no expectation of privacy where roomers had a "custom" of leaving their front door unlocked). Here, the evidence showed only that the front door was unlocked around 10:00 a.m. on March 19, 2016, but not at any other time.

In addition, as Professor LaFave has observed, "the absence of a lock on the premises is typically viewed as manifesting that hallways and other common areas are open to the public when the place is an apartment building, hotel or motel, but not when the place is a one-unit residence." 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b) p. 745 (5th ed. 2012). In discussing living arrangements like those enjoyed by defendant, however, LaFave explained:

> With respect to a rooming house, the better view is that except in the case in which it is very obvious from other circumstances that the rooming house is open to the general public, a rooming house is to be treated in this respect as if it were a single-unit dwelling, so that an unlocked or even open outer door cannot be treated by the police as alone manifesting an invitation to enter.

[2 Wayne R. LaFave et al., <u>Criminal Procedure</u> § 3.2(c) p. 89 n.118 (4th ed. 2015).]

Based on Estevez's testimony, the residential structure on Spring Street was a rooming or boarding house with communal living arrangements, akin to the home in <u>Titus</u>. In that regard, we agree with the observation by the <u>Titus</u> court that "it is not any inherent nature of a hallway that controls, but rather what the hallway links (<u>i.e.</u>, individual self-contained living units versus shared traditional living areas)." 707 So.2d at 711. Here, Estevez testified to a single communal bathroom connected by the hallway outside defendant's room. Further, although the record does not contain direct evidence that the home had a communal kitchen, the State did not establish that the rooms had separate kitchens considering Estevez's observation that defendant's spartan eight foot by eight foot room contained but a mattress, a window, a dresser, and personal property on the floor. <u>See</u> <u>Sencion</u>, 454 N.J. Super. at 32 ("The State bears the burden of justifying a warrantless search or seizure.").

Finally, as noted, the police entered the Spring Street dwelling on two separate occasions. To the extent there was any urgent need to cross the threshold of the home initially, such cause was addressed when the police cleared the common areas. The record contains no support for the warrantless reentry of the premises or the police's presence outside defendant's room, and we decline to endorse an "inroad[] upon the reasonable expectations of privacy

23

of the lesser situated of our citizens who are forced by economic circumstances to reside in rooming houses." See Titus, 707 So.2d at 710 (quoting People v. Garriga, 596 N.Y.S.2d 25, 29 (App. Div. 1993)).  Accordingly, we determine that society is willing to treat as private the space between a person's bedroom and bathroom in such settings.

In sum, we conclude that because the police did not have a warrant, and the State failed to establish that the common areas of the Spring Street dwelling were open to the public, the officers' second entry that led to defendant's arrest and the seizure of the marijuana and gun was constitutionally impermissible.  Therefore, the plain view doctrine does not justify the government's warrantless search.  Thus, the State failed to carry its burden of establishing that an exception to the warrant requirement justified the entry into the home.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2490-17T4