940 A.2d 299

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MORGAN C. SCOTT, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 6, 2006—Decided September 21, 2006.

Before Judges WEFING, FUENTES and GRAVES.

*Adam W. Toraya*, Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney; *Mr. Toraya*, of counsel and on the brief).

*Christopher W. Hsieh*, Senior Assistant Prosecutor, argued the cause for respondent (*James F. Avigliano*, Passaic County Prosecutor, attorney; *Mr. Hsieh*, of counsel and on the brief).

PER CURIAM.

In a three-count indictment, defendant Morgan Scott and co-defendant Shariffe Parks were charged with third-degree possession of cocaine, *N.J.S.A.* 2C:35–10(a)(1) (count one); third-degree possession of cocaine with intent to distribute, *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(3) (count two); and third-degree possession of cocaine with intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35–7 (count three). Defendant and co-defendant were also charged with possession of marijuana in a motor vehicle, a disorderly persons offense. On January 12, 2004, the jury found defendant and co-defendant guilty on all counts.

At sentencing, the court merged counts one and two into count three, and imposed a five-year state prison term with three years of parole ineligibility. The trial judge also found defendant guilty of the marijuana possession charge, and defendant received a concurrent ninety-day jail term. Appropriate monetary sanctions and suspension of driving privileges were also imposed.

On appeal, defendant makes the following arguments:

POINT ONE

THE DEFENDANT['']S MOTION FOR A JUDGMENT OF [ACQUITTAL] SHOULD HAVE BEEN GRANTED AS THE EVIDENCE DID NOT SUPPORT THE VERDICT.

POINT TWO

THE COURT ERRED IN ALLOWING TESTIMONY THAT THE DEFENDANT MADE STATEMENTS ABOUT HIS GUILT AND GAVE THE OFFICERS A COMBATIVE ATTITUDE AFTER BEING ARRESTED.

A. THE COURT ERRED IN FAILING TO CONDUCT A PRELIMINARY HEARING PURSUANT TO RULE 104(c) WHICH IS REQUIRED TO DETERMINE THE ADMISSIBILITY OF AN ALLEGED PRIOR STATEMENT MADE BY A CRIMINAL DEFENDANT.

B. THE COURT ERRED IN FAILING TO CONDUCT A PRELIMINARY HEARING PURSUANT TO RULE 404 TO DETERMINE IF EVIDENCE OF THE DEFENDANT['']S CHARACTER WOULD BE ADMISSIBLE. (NOT RAISED BELOW)

POINT THREE

COMMENTS MADE BY THE PROSECUTOR DURING OPENING STATEMENTS AND CLOSING ARGUMENTS RESULTED IN SUBSTANTIAL PREJUDICE TO DEFENDANT['']S FUNDAMENTAL RIGHT TO HAVE THE JURY FAIRLY ASSESS THE CASE AGAINST HIM. (NOT RAISED BELOW)

POINT FOUR

THE TRIAL COURT ERRONEOUSLY [FAILED] TO GRANT A MISTRIAL AFTER IMPROPER EVIDENCE ABOUT THE DEFENDANT'S OTHER OUTSTANDING WARRANTS WAS PRESENTED TO THE JURY.

POINT FIVE

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

POINT SIX

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT SENTENCED THE DEFENDANT TO A [G]ROSSLY DISPROPORTIONATE MAXIMUM TERM.

After reviewing the record and the applicable law in light of the contentions advanced on appeal, we have determined that this

matter must be remanded to the trial court for additional proceedings consistent with this opinion.

At approximately 12:20 a.m. on October 28, 2002, Officer Felix Arroyo and Sergeant Stanley Rodriguez of the Paterson Police Department, while on patrol in an unmarked police car in the area of Tenth Avenue and East 30th Street, observed a white Jeep Cherokee being driven with its headlights off and swerving from side to side over the double-yellow line. The officers activated their lights and sirens near East 30th Street and Tenth Avenue and followed the Jeep until Tenth Avenue and 33rd Street, at which point the Jeep pulled over and stopped in a Dunkin' Donuts parking lot.

Arroyo, the driver of the unmarked police vehicle, approached the driver's side of the Jeep, and Rodriguez approached the passenger's side. When the driver of the Jeep, co-defendant Shariffe Parks, rolled down his window, Arroyo detected a strong odor of raw marijuana. Arroyo asked Parks for his driver's license, registration card, and insurance card. After Parks stated that he did not have a driver's license, Arroyo asked him to step out of the vehicle. Arroyo subsequently learned that Parks's mother was the registered owner of the Jeep Cherokee.

While Arroyo was speaking with the driver of the Jeep, his partner, Sergeant Rodriguez, "was illuminating the inside of the car with his flashlight." Arroyo testified that as Parks exited the vehicle, his partner said something to him, and Arroyo "then observed in plain view a large plastic bag" that he believed contained CDS. Subsequent testing revealed that the "large plastic bag" on the floor of the Jeep contained nine clear bags of crack cocaine, twenty-one blue bags of crack cocaine, twenty-nine green bags of crack cocaine, and one plastic bag of marijuana.

Parks and defendant Morgan Scott, who was a passenger in the front seat of the Jeep, were both arrested for possession of a controlled dangerous substance, and they were transported to police headquarters. During processing, it was learned that Parks, age 28, and defendant, age 43, were both residents of

Paterson. Parks stated that he resided at 317 East 26th Street, and Scott stated that he resided at 379 East 29th Street. The police seized the sum of $299 in cash from Parks, but neither Parks nor defendant had any contraband on their person.

Arroyo told the jury that the bag containing the crack cocaine and marijuana was located in front of the driver's seat. During his direct testimony, Arroyo was asked to prepare "a very basic diagram as to where you saw this bag of drugs in the car." After doing so, he testified as follows:

Q. All right. And why don't you put a DR for driver's side of the car.

A. (Witness complies.)

Q. Okay. And that dot that you drew on the diagram, what does that signify?

A. Where the bag was, laying on the ground.

Q. Okay. So do you want to—were there seats in the car?

A. Yeah, this would be the driver's seat, and this is the passenger seat.

Q. Okay. So how far from the driver's seat was the bag of drugs on the floor of the car?

A. It was protruding maybe ... 12 inches from the front of the seat sticking out just a little.

Q. Okay. So—you know, maybe it's easier to describe it visually. Why don't we—I'm going to ask you to just come down to the center of the courtroom, and perhaps you can demonstrate—if this is the driver's seat, just demonstrate—put that where you saw it.

A. (Witness complies.)

Q. Okay. So, for the record, it appears to be pretty much centered in the middle of the driver's seat?

A. Right.

Q. And not covered by the driver's seat?

A. No, it was in front of the driver's seat.

Based on his training and experience, Arroyo, a nine-year veteran, testified that the twenty-one blue bags and the twenty-nine green bags, which were both smaller than the clear bags, had a street value of $10 each, and the nine clear bags had a street value of $20 each. During cross-examination, Arroyo was again asked about the location of the drugs in the Jeep, and he confirmed that the drugs were found in front of Shariffe Parks's feet.

Detective Conyers also testified for the State. He told the jury that he had been involved in "anywhere between 12 and 15,000"

narcotics-related arrests or investigations during the course of his seventeen years with the Paterson Police Department. When he was asked to describe the smell of marijuana, he stated: "It's an unusual smell. It smells kind of pungent. It doesn't smell like anything I've ever smelled before so it has an unusual smell, but you would know the smell of it if you've ever been exposed to it." Based on his training and experience, Conyers also testified that crack cocaine is commonly packaged to be sold on the street in small ten or twenty-dollar bags because most people who use crack can't afford to buy in bulk. He also told the jury that it's "very common" for drug dealers to work together in teams "for a lot of reasons."

Neither defendant nor co-defendant Parks testified at trial. After the State rested, defendant's attorney sought entry of a judgment of acquittal, pursuant to *Rule* 3:18–1. Defense counsel also filed a motion for a new trial prior to sentencing. *R.* 3:20–1. The standard for reviewing a claim that the evidence is insufficient to support a verdict was articulated by the Supreme Court in *State v. Reyes,* 50 *N.J.* 454, 459, 236 *A.2d* 385 (1967):

> [W]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

In denying defendant's motion for a directed verdict at the close of the State's case, the trial judge reasoned there were "plenty of inferences" that the drugs were possessed with an intent to distribute, and the court concluded that the State had satisfied the *Reyes* standard:

> [W]hat tips the scales in my view in this situation are the following factors:
>
> The fact that it was 12:20 a.m., the fact that the stash of the controlled dangerous substances as packaged [was] in plain view. Counsel made reference to them being under the seat of the driver, but the testimony of Officer ... Arroyo ... [c]learly showed and he physically demonstrated that it was not under the seat; it was directly in front of the seat and effectively between the driver's legs. It was in plain view. We don't know yet whether the passenger saw it.
>
> We may never know what he actually knew, but it was in plain view, and more significantly from the point of view of defendant Parks is the question which arises and the inference which can be drawn. What is the likelihood that if Mr. Scott

> were not his confederate that [Mr. Parks] would [have] allowed him into the car merely as a passenger.

When defendant's attorney renewed his motion for a judgment of acquittal at the end of the entire case, the trial court supplemented its reasons for denying the motion:

> [A]fter the motion was ruled on earlier ... it occurred to me there was something already in the evidence, which also I think is an additional factor for denial of the motion, which is that the vehicle was coming from the direction of East 26th Street which is where defendant Parks lives. The vehicle turned at about East 28th Street and continued on down Tenth Avenue.
>
> Mr. Parks lives at 29th, continued past where it should have gone if ... Mr. Parks were simply giving Mr. Scott a ride home, and continued on down Tenth Avenue ultimately into Dunkin Donuts, but that fact is suggestive of something other than just a ride home from one friend's house to another or from somebody finding someone near their house and giving a ride to his home, and it was again, as I pointed out, 12:20 a.m.

■ The record clearly supports the trial court's analysis. In addition, the court's decision to deny defendant's motion for acquittal was also supported by the strong odor of raw marijuana coming from the Jeep; the testimony that it is very common for drug dealers to work together in teams; and the permissible inference that the occupants of the Jeep were trying to figure out where they could hide the drugs when they proceeded for several blocks to the Dunkin' Donuts parking lot after being signaled by the police to pull over.

■ We recognize, of course, that "possession cannot be based on mere presence at the place where contraband is located. There must be other circumstances or statements of defendant permitting the inference of defendant's control of the contraband." *State v. Whyte*, 265 *N.J.Super.* 518, 523, 628 A.2d 340 (App.Div. 1992), *aff'd*, 133 *N.J.* 481, 628 A.2d 287 (1993). *N.J.S.A.* 2C:35–10(a) provides that it is "unlawful for any person, knowingly or purposely ... to possess, actually or constructively, a controlled dangerous substance...." Possession requires that "the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession." *N.J.S.A.* 2C:2–1(c). Thus, criminal possession signifies "intentional control and dominion, the

ability to affect physically and care for the item during a span of time, accompanied by knowledge of its character." *State v. Brown,* 80 *N.J.* 587, 597, 404 *A.*2d 1111 (1979) (citations and internal quotation marks omitted). "Physical or manual control of the proscribed item is not required as long as there is an intention to exercise control over it manifested in circumstances where it is reasonable to infer that the capacity to do so exists." *Ibid.* "Ownership in conjunction with possession is not a required element of the possessory crime; one can knowingly control something without owning it and be guilty of unlawful possession." *Id.* at 598, 404 *A.*2d 1111. "Proof of possession may be by circumstantial evidence as well as direct evidence." *State v. Rajnai,* 132 *N.J.Super.* 530, 536, 334 *A.*2d 364 (App.Div.1975); *accord State v. Foreshaw,* 245 *N.J.Super.* 166, 186, 584 *A.*2d 832 (App.Div.), *certif. denied,* 126 *N.J.* 327, 598 *A.*2d 886 (1991). Possession need not be actual but may be constructive, and "need not be exclusive but may be jointly exercised by two or more persons." *Rajnai, supra,* 132 *N.J.Super.* at 536, 334 *A.*2d 364; *accord Foreshaw, supra,* 245 *N.J.Super.* at 186, 584 *A.*2d 832.

Our review of the record convinces us that the State presented ample evidence from which both physical and constructive possession of the cocaine could be inferred. According to the State's proofs, the plastic bag containing the cocaine and marijuana was located in plain view on the floor of the Jeep, in an area that was readily accessible to defendant. We conclude from the location of the cocaine, together with the additional proofs and the reasonable inferences to be drawn therefrom, that the State presented sufficient proof to establish beyond a reasonable doubt that defendant possessed the drugs with intent to distribute them. We therefore reject defendant's argument that the trial court erred in denying his motion for a judgment of acquittal and his motion for a new trial.

Defendant also contends that the trial court's refusal to conduct a preliminary hearing to determine the voluntariness and admissibility of incriminating statements he allegedly made denied

him his right to a fair trial. This issue arose in connection with the testimony of Sergeant Rodriguez, who was called as a witness by co-defendant Parks. During direct examination of Rodriguez by Parks's attorney, Rodriguez provided the following testimony:

Q. Was there any conversation—did you have any conversation with either one of them?

A. I believe Mr. Scott.

Q. Did he say anything to you about the drugs?

A. No, no. I was just asking him routine booking questions when we got to headquarters.

Q. Like what?

A. His name, where he lived.

The State followed up on this during cross-examination:

Q. Now Mr. Rosenfelt brought up the fact that you had a conversation with Mr. Scott.

A. Yes.

Q. Isn't it a fact that he gave you a bit of attitude?

MR. KEYS [Defendant's Attorney]: Your Honor, I'm going to object here under *Rule* 104.

MS. KANE [Assistant Prosecutor]: Judge, the door was opened by Mr. Rosenfelt.

MR. KEYS: Not me.

THE COURT: The door was opened, the door was opened.

MR. KEYS: Not by me, Your Honor.

THE COURT: I understand, but it's been opened in this trial.

MR. KEYS: Fine.

THE COURT: I'll allow it.

BY MS. KANE:

Q. You can go ahead and answer the question.

A. Yes, he did, ma'am.

Q. And what—how would you describe what he gave you a little bit of an attitude.

A. He was [of] a very combative nature, stating it wasn't his, this and that, the narcotics weren't his.

Q. Okay. And did he say something to you to the effect that you got nothing on me?

A. Yes, he did, ma'am.

During summations, the State repeatedly argued to the jury that the alleged statement "you've got nothing on me" was an admis-

sion by defendant that he was aware that there were drugs in the Jeep:

> But just remember, you've got nothing on me. You've got nothing on me is a little different than saying, oh, oh, I had no idea, I had no idea, I'm not involved in this. You've got nothing on me.
>
> It's for you to decide. He had no obligation to say anything but he chose to say to the police officer, you've got nothing on me. That's the circumstance to consider. Does that sound right, if he's so innocent as Mr. Keys portrays him? Or does he sound [like] someone who thinks he knows the law because the drug ended up by Mr. Parks, he's free and clear, Mr. Parks has to take the weight for their mutual crimes.
>
> . . . .
>
> [I]f in fact the drugs were really on the floor in front of Mr . . . . Parks that whole time and the car smelled like marijuana, you don't think he's aware of that? . . . . [A]nd if he wasn't aware, if . . . he is not involved and he smells the marijuana and knew it was marijuana and found out there was drugs in the car don't you think he'd say, you know what, this is my street, just drop me off here or anywhere along the way, just let me out. Just let me out, I want nothing to do with this. No, he stays in the car and he said to the police when they finally arrest him, hey, you got nothing on me. Not, like, what's this about? You got nothing on me.
>
> . . . .
>
> Again, I've mentioned this repeatedly, you've got nothing on me, more circumstantial evidence that he was not an innocent passenger who had no idea what was going on. Sounds more, ladies and gentlemen, to me like someone who says, all right, the cops are behind us, I'm looking out for myself. I'm going to throw the drugs over by Parks and he's got the money, the car's registered to his mother, I'm clear, and the cop comes up and he gives Officer Rodriguez a bit of an attitude, you've got nothing on me.

"Voluntariness of a confession or other inculpatory statement by an accused must always be established at a *N.J.R.E.* 104(c) hearing before it can be introduced into evidence at trial." Biunno, *Current N.J. Rules of Evidence,* comment 6 on *N.J.R.E.* 104 (2006) (citing *State v. Miller,* 76 *N.J.* 392, 404–05, 388 *A.2d* 218 (1978)). The State contends that defendant's alleged statements "appear to have been spontaneously made . . . Under these circumstances, the admission of the statements without an *Evid. R.* 104 hearing was not harmful error." We reject this argument, however, because the State's proofs were less than overwhelming, and, as noted by the trial court, it would not have been surprising "to see the jury go the other way." We conclude that the trial court erred in failing to conduct the preliminary hearing requested

by defense counsel, and we also conclude that the error was not harmless beyond a reasonable doubt. *See State v. McCloskey,* 90 *N.J.* 18, 30, 446 *A.*2d 1201 (1982) (noting that "errors which impact substantially and directly on fundamental procedural safeguards ... are not amenable to harmless error rehabilitation" (internal quotation marks omitted)). We therefore remand this issue for a voluntariness hearing. *State v. Kelly,* 61 *N.J.* 283, 294–95, 294 *A.*2d 41 (1972); *State v. Marczak,* 344 *N.J.Super.* 388, 398, 782 *A.*2d 440 (App.Div.2001), *certif. denied,* 171 *N.J.* 44, 791 *A.*2d 222 (2002).

■ If defendant's alleged statement was not voluntary and admissible, then he will receive a new trial. As the Court stated in *Kelly:*

> We believe that the interests of justice will best be served by now having the trial judge conduct the hearing on voluntariness. If at the hearing the State fails to establish voluntariness beyond reasonable doubt the defendant will be entitled to a new trial at which the statements will be excluded. If, however, the State does establish beyond reasonable doubt that the statements were voluntary, and the trial judge so determines, then the defendant's conviction may stand.

> [*Kelly, supra,* 61 *N.J.* at 294, 294 *A.*2d 41 (citations omitted).]

■ Defendant also challenges his sentence. At sentencing, on March 19, 2004, the trial court acknowledged that defendant did not have an extensive prior criminal record, and it gave the following reasons for defendant's sentence:

> THE COURT: His prior record is not a hugely aggravating factor, but it's an aggravating factor. He had several convictions for offenses of the criminal domestic violence nature.
>
> . . . .
>
> The—one of which he was sentenced to—it was either three years custodial or three years probation. There's no question that he only did about a week in the county jail there, and then the rest of it was served as probationary time.
>
> And that's about it. . . . [T]here [were] a few DP's [sic] for which mere fines were imposed on three occasions on domestic violence cases. One of them was criminal mischief as well. All between '95 and '99, it seems.
>
> . . . [O]ther aggravating factors are the risk that Mr. Scott would have been involved in this sort of activity . . . [and] the need to deter him and others from drug distribution activities.
>
> There are no mitigating factors that I can see.

Accordingly, and given the nature of the 1,000-foot-law ... on Count Three ... Mr. Scott will be sentenced to serve five years in the state prison. He's to serve three years of that time before being eligible for parole.

Because defendant does not have an extensive criminal record, and neither the judge's findings nor the record justify imposition of a five-year maximum term for a third-degree offense, we remand for resentencing. In addition, we agree that defendant's term violates the sentencing principles announced in *Blakely v. Washington,* 542 *U.S.* 296, 124 *S.Ct.* 2531, 159 *L.Ed.*2d 403 (2004), and *State v. Natale,* 184 *N.J.* 458, 878 *A.*2d 724 (2005). In *Natale,* the Court held that "a sentence above the presumptive statutory term based solely on a judicial finding of aggravating factors other than a prior criminal conviction, violates a defendant's Six Amendment jury trial guarantee." *Id.* at 466, 878 *A.*2d 724. Here, it is clear that the aggravating factors cited by the trial court were not based solely on defendant's prior criminal record. Accordingly, defendant is entitled to be resentenced. *Id.* at 495, 878 *A.*2d 724.

We have determined that defendant's remaining contentions are without sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(2). Consequently, the matter is remanded to the trial court for further proceedings. If the remand proceedings result in a determination that the statements attributed to defendant were voluntary and admissible, then a new trial is not warranted. But defendant shall be resentenced.

The matter is remanded for additional proceedings consistent with this opinion.

FUENTES, J.A.D., Dissenting.

My colleagues in the majority have concluded that the State presented sufficient evidence to establish that defendant actually or constructively possessed the cocaine found in the vehicle in which he was a passenger. I disagree and therefore dissent. In my view, the State failed to prove, beyond a reasonable doubt, the three essential elements of possession; namely that defendant (1) was aware of the presence of the package in which the cocaine was found in the car; (2) had knowledge of its character, that is that

the package contained cocaine; and (3) intended or had the capacity to exercise control or dominion over the drugs.

The State's evidence as to possession consisted entirely of the testimony of the two arresting officers. From the moment the officers first observed Parks driving the Jeep Cherokee in an erratic fashion and without headlights, there was no indication that defendant, as the front-seat passenger, acted in a suspicious manner. When the two officers approached the vehicle, Officer Arroyo from the driver's side, and Officer Rodriguez from the passenger's side, they did not see defendant engage in any action or movement that led them to conclude or even suspect that defendant was aware of the existence of any contraband.

In this context, the majority found that:

[T]he court's decision to deny defendant's motion for acquittal was also supported by the strong odor of raw marijuana coming from the Jeep; the testimony that it is very common for drug dealers to work together in teams; and the permissible inference that the occupants of the Jeep were trying to figure out where they could hide the drugs when they proceeded for several blocks to the Dunkin' Donuts parking lot after being signaled by the police to pull over.

[398 *N.J.Super.* at 150, 940 *A.*2d at 304]

The record does not support these conclusions.

First, it is undisputed that both arresting officers testified to detecting the strong odor of "raw" marijuana when Parks rolled down the car-window. As the following excerpts from Arroyo's direct testimony illustrate, however, the police were able to recognize this particular scent only because of their specialized training and experience.

Q. And the driver, also Mr.—known as Mr. Parks, then did he roll down the window?

Officer Arroyo: Yes.

Q. What, if anything, caught your attention next?

Officer Arroyo: I detected a strong odor of raw marijuana.

Q. Okay. Now—and how did you recognize it to be the odor of raw marijuana?

Officer Arroyo: Past training.

Q. Now you're saying 'raw marijuana,'—you're specifying 'raw marijuana.' What—is there a significance to the smell of raw marijuana as opposed to some other kind?

Officer Arroyo: Well, it's not like—it's not burnt. Not somebody that was just smoking marijuana, a different smell.

Q. Okay. So are you, based on your experience, familiar with how raw marijuana smells versus how burnt marijuana smells?

Officer Arroyo: Yes.

Because defendant did not testify, there is no evidence from which a rational factfinder can conclude that defendant had the necessary training or experiences to have detected the distinct odor of raw marijuana.

Second, the drugs were found in a plastic package, beneath the driver's seat. Even the officer who first discovered the package admitted that he noticed it only after pointing his flashlight directly at the location where it was hidden. Once detected, the officer was able to identify the package's illicit nature only because of his training and experience as a veteran police officer.

Q. When you first flashed your light down there and you saw something down there, did you know in a split second that it was drugs or did it take you a couple of seconds to figure out what's that shining between Mr. Parks' feet?

A. It took me a little bit to actually focus on what it exactly was.

Q. So you couldn't immediately identify it as CDS?

A. No, I couldn't.

Q. Even though in your experience you've seen CDS a lot.

A. Yes, I have, sir.

Q. I think you've testified fifty to 100 different arrests?

A. About 100, 150.

Q. And you've gone through the DEA training that we've talked about.

A. Yes, I have, sir.

There is no evidence that defendant had the necessary training or experiences to have detected the illicit nature of the package.

Finally, the majority's conclusion that "it is very common for drug dealers to work together in teams" and that a permissible inference can be drawn that "the occupants of the Jeep were trying to figure out where they could hide the drugs when they proceeded for several blocks to the Dunkin' Donuts parking lot after being signaled by the police to pull over," is based on nothing more than rank speculation.

There is absolutely no evidence in the record to indicate that defendant and Parks were acting as "a team." The police did not observe the two men engaged in any kind of furtive movements before the vehicle came to a stop, or at any time thereafter. The evidence before the jury can only suggest that defendant was nothing more than a mere passenger in a car driven by Parks. Further, no rational inference can be draw against defendant from Parks' failure to pull over immediately in response to the police's direction to do so. Defendant was not in control of the vehicle, and there is no evidence to indicate that he exerted any influence over its driver.

As we noted in *State v. Whyte*, and as my colleagues in the majority pointed out, "[i]t is clear that constructive possession cannot be based on mere presence at the place where contraband is located. There must be other circumstances or statements of defendant permitting the inference of defendant's control of the contraband." 265 *N.J.Super.* 518, 523, 628 *A.2d* 340 (App.Div. 1992), *aff'd o.b.*, 133 *N.J.* 481, 628 *A.2d* 287 (1993). The factual circumstances in *Whyte* are remarkably similar to those presented here.

> The contraband here did not have a value of anything like the magnitude which apparently influenced the Court in *Palacio*[1]. None of the passengers acted in any way furtively or suspiciously. If we assume that the trip originated either in the Bronx or in Brooklyn, it was relatively brief in both distance and duration. We certainly could not, nor could a jury, speculate on its destination. There is no other fact here indicating the passengers' knowledge that the van contained contraband, no less that they were co-possessors of it.... There is a world of difference between speculation and legitimate inference, and we conclude that the convictions here rested on speculation.
>
> [*Id.* at 525, 628 *A.2d* 340.]

Here, defendant and the driver were apprehended while traveling through the streets of the City of Paterson. There is no indication that the trip originated from a long distance. As discussed, no

---

[1] In *Palacio*, the illicit drugs found in the vehicle had an estimated value of just under one million dollars. *State v. Palacio*, 111 *N.J.* 543, 545–46, 545 *A.2d* 764 (1988).

evidence exists that would allow a rational jury to infer that defendant had knowledge of the contents of the package.

In this light, the majority's conclusion that "the State presented ample evidence from which both physical and constructive possession of the cocaine could be inferred," is not supported by the evidence presented, and is erroneous as a matter of law.

I therefore respectfully dissent.