**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0689-18T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARREN E. RICHARDSON,

     Defendant-Appellant.

_____

> Argued March 2, 2020 – Decided May 15, 2020
>
> Before Judges Fasciale and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 13-03-0272.
>
> John Vincent Saykanic argued the cause for appellant.
>
> Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Valeria Dominguez, of counsel and on the brief).

PER CURIAM

Defendant Darren E. Richardson appeals from a September 21, 2018 judgment of conviction. Following the denial of his motion to suppress, defendant pled guilty to second-degree possession of a controlled dangerous substance with intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(10), and he was sentenced to ten years' imprisonment with a five-year period of parole ineligibility.[1] On appeal, he raises the following issues:

POINT I

THE MARIJUANA SEIZED MUST BE SUPPRESSED, THE CONVICTION REVERSED AND THE INDICTMENT DISMISSED AS THERE ARE NO VALID EXCEPTIONS TO THE WARRANT REQUIREMENT; (U.S. CONST. AMEND. IV; N.J. CONST. ART. I, PARA. 7).

. . . .

SUBPOINT A

NEITHER "PLAIN VIEW" NOR ANY OTHER WARRANTLESS SEARCH EXCEPTION APPLIES.

---

[1] Related charges for acting as the leader of a narcotics trafficking network, conspiracy, and possession were dismissed.

A-0689-18T2

SUBPOINT B

AS THE OFFICERS WERE NOT PERMITTED ON THE PROPERTY OF THE STORAGE FACILITY THE SEARCH AND SEIZURE IS ILLEGAL.

POINT II

THE ILLEGAL AND WARRANTLESS SEIZURE OF DEFENDANT FOR AN EXTENDED PERIOD OF TIME WHILE THE SEARCH WARRANT WAS DRAFTED MANDATES SUPPRESSION.

POINT III

THE COMMUNICATIONS DATA WARRANTS TO INSTALL THE 24HR/7DAY GPS TRACKING OF [J.S.'S] BMW WERE IN VIOLATION OF THE FEDERAL (U.S. CONST. AMEND. IV) AND NEW JERSEY (N.J. CONST. ART 1, ¶ 7) CONSTITUTIONS AND [THE NEW JERSEY WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, N.J.S.A. 2A:156A-1 to -37] SINCE: A) THE AFFIANT FAILED TO CLAIM THAT THE GPS WAS NECESSARY; B) THE AFFIANT NEVER ALLEGED THAT HE WAS UNABLE TO UTILIZE CONVENTIONAL POLICE TECHNIQUES TO CONDUCT THE INVESTIGATION; AND C) THE AFFIANT CLAIMED INFORMATION FROM THREE (3) CI'S WHO WERE NEVER ALLEGED TO HAVE ANY PRIOR ARRESTS OR RELIABILITY.

Based on the affidavit submitted for a communications data warrant (CDW) and the testimony elicited at the suppression hearing, we agree with Judge Joseph A.

3

Portelli's conclusions that the issuance of the CDW was lawful, there was no expectation of privacy in the common area of the storage facility, and defendant was lawfully detained. Accordingly, we affirm.

We discern the following facts from the affidavit submitted for the CDW and from the suppression hearing, where a single witness, Captain Daniel Bachok[2] of the Passaic County Prosecutor's Office Narcotics Unit (the Narcotics Unit) testified.

During the summer of 2012,[3] the Narcotics Unit began investigating two individuals, defendant and J.S., after confidential informants (CIs) reported that they were dealing marijuana in the Wanaque area. According to Detective Stephen Day of the Narcotics Unit, CI #1 and CI #3 reported that defendant would buy marijuana in California and ship it to New Jersey through the mail, and an anonymous female reported that J.S. planned to travel with defendant. CI #1 also reported that defendant had J.S. drive him around in a dark colored BMW, registered to defendant's brother, and he also used other individuals to "deal for him." CI #2, discovered by Detective Sergeant Charlie Sahanas of the

---

[2] Captain Bachok was a lieutenant during the investigation.

[3] All events pertaining to the investigation occurred during the year 2012.

A-0689-18T2

Wanaque Police Department, reported that he or she had previously purchased marijuana from defendant and J.S. CI #3 confirmed that he or she had also "dealt with [defendant] in the past" and with J.S., who was known to be one of defendant's "runners." The CIs were deemed reliable because of law enforcement's independent corroboration of the tips, including the fact that CI #1 previously provided tips that "resulted in arrests and seizures of illegal narcotics and United States [c]urrency." Although Captain Bachok did not learn this information firsthand, as the investigation involved several officers, he generally understood this to be the basis for the investigation, and he also understood that defendant and J.S. planned to ship the marijuana in a suitcase.

Based on these tips, the Narcotics Unit prepared to apply for a CDW to track the vehicle J.S. drove to identify the "stash location," defined as the "place[] where drug dealers would leave their drugs sometimes, [but] not at their personal residence." They continued to surveil defendant and J.S., and during the week of September 9, they arranged for CI #3 to participate in a controlled buy of marijuana from J.S.

On September 20, Detective Day applied for "a [CDW] and [s]earch [w]arrant authorizing the continued use of a signal monitoring and tracking device" on the BMW that J.S. drove. The tracker would allow law enforcement

"to instantly and continuously track the position and location of the captioned vehicle and receive monitoring signals" to aid in their investigation. Based on the confidential tips, there was "probable cause to believe that the captioned vehicle [was] being utilized by . . . [J.S.] to aid in the commission of [several possessory] crimes." The tracker was necessary because law enforcement had "made efforts to conduct surveillance . . . in the past, which [proved] to be very difficult, as [defendant] and . . . [J.S. were] familiar with the Wanaque Police Department [d]etectives and their undercover vehicles." Additionally, "the rural area . . . and minimally traveled roads of civilian vehicles [made] . . . continued surveillance difficult."

The warrant was authorized the same day, and Captain Bachok then installed the tracker on the black BMW identified in the affidavit. Through efforts to track the vehicle, the Narcotics Unit observed what were believed to be "hand to hand drug transactions on several occasions."

On October 1, the Narcotics Unit observed defendant, in a blue BMW, and J.S., in the black BMW, drive to a storage facility on Hamburg Turnpike in Wayne (the storage facility). Captain Bachok described the storage facility as "wide open," meaning storage units could be seen from the street. A chain link fence surrounded the property, and the entrance was guarded by a gate and

6

keypad. On the property, there were "a bunch of garages all over and . . . surrounding the perimeter."

Defendant drove the blue BMW into unit 3020. According to Captain Bachok, unit 3020 was a garage-like unit accessible from the storage facility's common space, and it was the third unit in from the perimeter. It was about 300 feet away from the entrance and could be "clearly" seen from the public street. After defendant entered the unit, he exited his vehicle and got into the black BMW, and he and J.S. drove away from the storage facility. The Narcotics Unit followed the black BMW to the George Washington Bridge and then tracked it first to John F. Kennedy Airport (JFK) and then to LaGuardia Airport (LaGuardia).

On October 3, the Narcotics Unit tracked J.S.'s car to a parking garage at LaGuardia. Inside the airport, it "identif[ied] the airline that [J.S.] had used to fly out to California" and learned that she planned to return to New Jersey on October 4. The following day, it observed J.S. depart from the airplane and leave the LaGuardia parking lot in the black BMW.

On the morning of October 5, the Narcotics Unit tracked J.S. to her mother's home in Wanaque, and Captain Bachok observed her accept a FedEx package, although he was unable to see where she placed the package after she

7

accepted it.  Soon after, the Narcotics Unit observed J.S. driving away in the black BMW and tracked her to the storage facility.  By the time they arrived at the storage facility, J.S. was driving away in the black BMW, so Captain Bachok entered the premises through an open gate, parked in the parking lot, and asked an employee in the office to view the security video.  Upon viewing the video, he observed J.S. park in front of unit 3020, get out of the vehicle, enter the storage unit, and get back into the vehicle, but he could not "see her actually do anything."

After J.S. left the storage facility, she was tracked to JFK and then to her and defendant's Oakland residence, and defendant was observed riding in the black BMW upon her return from JFK.  Around 8 p.m., they returned to the storage facility.  J.S. was driving, defendant was in the front passenger seat, and Lance S. Richardson[4] (defendant's nephew) and a woman were in the back.  Defendant and Lance exited the vehicle, and J.S. and the female passenger departed in the black BMW.

Defendant and Lance then opened unit 3020.  A surveillance unit drove onto the premises of the storage facility "to see what they were doing."  Captain

---

[4] We refer to Lance S. Richardson by his first name because he and defendant share the same last name.  We intend no disrespect in doing so.

Bachok had been unable to observe how the unit gained access to the premises but testified that he was not aware of anyone having an access code to open the gate. The surveillance unit parked on the far side of the storage facility, leaving the center building between them and unit 3020. Detective Sergeant Sahanas also approached unit 3020 on foot and observed from the bushes located on the far side of the end unit nearby. Captain Bachok remained outside the facility and could not "see [what was] going on." At this time, neither he nor anyone else involved in the investigation had seen any contraband on the premises.

After defendant and Lance entered unit 3020, Captain Bachok entered the storage facility and parked his car facing the street. The facility's office was not open at the time, but he was able to enter the premises without a key or passcode because according to him, the gate was open. Captain Bachok watched defendant through his rearview mirror and noticed there was light inside the unit. Then, he and Detective Sergeant Sahanas observed defendant inside unit 3020, rolling a suitcase toward the trunk of his vehicle, which was also inside the unit. He also observed defendant and Lance notice his vehicle. Upon seeing defendant with the suitcase, Captain Bachok ordered "everybody to move in to . . . further investigate," believing that the suitcase contained marijuana. Captain

A-0689-18T2

Bachok testified that it was not until he saw defendant with the suitcase that he determined there was probable cause.

As Captain Bachok and the other officers approached unit 3020, defendant threw the suitcase into the trunk and closed it. The officers identified themselves, informed defendant and Lance about the investigation, and read them their Miranda[5] rights. Defendant verbally consented to a search of the storage unit and his vehicle, but a decision was made to apply for a search warrant, after a conversation with the chief assistant prosecutor.

After the storage facility was secured, within an hour of arriving at the facility, defendant and Lance were transported to the Wayne Police Department to be held until the search warrant was executed. While waiting to search unit 3020, a previously obtained search warrant was executed on the Oakland residence. Outside of the home, the box that had been delivered to J.S. the previous day was discovered. It was empty, but law enforcement later determined that defendant's suitcase fit inside.

Around 1:20 a.m. on October 6, a Wayne municipal court judge signed the search warrant for unit 3020, including defendant's vehicle. At 1:35 a.m.,

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

law enforcement returned to the storage facility through an open gate and executed the search warrant, recovering a medium-sized suitcase containing seventeen pounds of marijuana and a safe holding $9500 in cash.

Captain Bachok returned to the storage facility one morning about a month before the suppression hearing to record a video of the premises. During his visit, the gate was open. He also testified that he had "driven there many times after [5 p.m.] and at times it was open."

At the conclusion of the suppression hearing, the judge found Captain Bachok to be credible but explained that his testimony alone would not determine the outcome, as the ultimate issue was whether law enforcement was lawfully on the premises of the storage facility. After reciting the pertinent facts, the judge concluded that law enforcement had "reasonably articulable suspicion that criminal activity was occurring." Then, setting aside the issue of the lawfulness of the entry into the storage facility, the judge concluded that "[a]ll of this activity by the police and the way they conducted their investigation here and the eventual confiscation of the suitcase is all lawful."

Turning to law enforcement's entry into the storage facility, the judge noted that "[t]here are some very fine lines to be drawn here with respect to what the police can and cannot do and what they did in this case." He explained that

11

"[c]learly there would be a [F]ourth [A]mendment violation if there was a home involved," but here "it [got] dicey," as the area at issue was "a semi-public business" entitled to "a much lesser expectation of privacy." However, he acknowledged that areas in a business "not open to the general public" are entitled to Fourth Amendment protection.

The judge found that "the area where [defendant] had his storage facility was not open to the general public," and his unit "was visible from the street, making it more . . . visible to the public." Additionally, it was problematic that lessees of other units could have observed defendant's activities on the premises. The judge acknowledged that it was "a fine line" and concluded,

> I'm not comfortable with the way law enforcement acted when they got to the storage facility. I'm not sure that they should have entered in the way that they did without a warrant.
>
> But because it's not a home, because it's a business establishment, where there are others who rent there and have access to the area, . . . there is a lesser expectation of privacy, . . . and I can't ignore [that] you can also see this unit from the street. So, where is the expectation of privacy?

Finally, the judge determined that the CDW was valid, based on his review of the affidavit and Captain Bachok's testimony. Although there might have been a discrepancy between statements made in applying for the CDW, the judge found it was "of no moment." Accordingly, he denied the motion to suppress.

A-0689-18T2

On appeal, defendant argues that law enforcement unlawfully entered the premises of the storage facility without a warrant because the property was not accessible to the public, and the plain view exception did not justify the warrantless entry. Consequently, the search of unit 3020 and the seizure of the marijuana from inside the storage unit were unlawful because they were direct results of an illegal search. Additionally, he contends that he was unlawfully detained while law enforcement waited for the search warrant because they lacked the requisite reasonable suspicion. Lastly, he disputes the validity of the CDW because of inconsistent statements made as to whether law enforcement was able to surveil him and J.S. before securing the CDW.

When reviewing the denial of a motion to suppress, we "must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). Deference is especially appropriate if the judge's findings "are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161

(1964)).  However, we need not defer to the judge's legal conclusions, which we review de novo.  Boone, 232 N.J. at 426.

The United States Constitution and the New Jersey Constitution both guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV; N.J. Const. art. I, ¶ 7.  Generally, to search or seize a person or a person's property, law enforcement must secure a warrant issued upon probable cause, unless one of the well-delineated exceptions applies.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Maryland, 167 N.J. 471, 482 (2001); see State v. Hill, 115 N.J. 169, 173-74 (1989) (listing the various exceptions to the warrant requirement).

A search warrant "is presumed to be valid once the State establishes that [it] was issued in accordance with the procedures prescribed by the rules governing search warrants."  State v. Robinson, 200 N.J. 1, 7 (2009) (quoting State v. Valencia, 93 N.J. 126, 133 (1983)).  The defendant bears the burden to prove that the warrant was not issued upon probable cause.  Ibid.

Probable cause is not precisely defined, but our courts have explained that it "exists when, considering 'the totality of the circumstances,' a person of 'reasonable caution' would be justified in believing that evidence of a crime

exists in a certain location." State v. Smith, 212 N.J. 365, 388 (2012) (quoting Schneider v. Simonini, 163 N.J. 336, 361 (2000)). Where informants' tips are involved, probable cause exists if, "given all the circumstances set forth in the affidavit[,] . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." State v. Sullivan, 169 N.J. 204, 212 (2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). An informant's reliability in prior instances is "probative of veracity." Id. at 213 (quoting State v. Smith, 155 N.J. 83, 94 (1998)). With respect to the informant's basis of knowledge, the informant may disclose how he or she knew of the criminal activity or provide a tip with "sufficient detail . . . that could not otherwise be attributed to circulating rumors or be easily gleaned by a casual observer." Ibid. (quoting Smith, 155 N.J. at 95). Alternatively, if law enforcement is able to "corroborate 'information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the basis of knowledge prong' as well as the veracity prong." Id. at 214 (quoting Smith, 155 N.J. at 96).

In granting the CDW, the judge correctly determined that there was probable cause. Law enforcement obtained information from various

confidential sources regarding defendant's and J.S.'s involvement in a large-scale drug operation. One of the CIs had proven reliable in prior investigations, and two of the CIs' tips were confirmed by the controlled buy and further surveillance. Further, the affidavit explained law enforcement's need for the tracker. The purpose of the tracker was "to instantly and continuously track the position and location" of the black BMW because based on the confidential tips, it was believed that the vehicle was being used to conceal and transport marijuana. Detective Day stated that previous efforts to track defendant and J.S. had proven difficult because of the remote areas they traveled and defendant's and J.S.'s familiarity with law enforcement. Captain Bachok confirmed this during the suppression hearing and further explained that J.S. was difficult to follow because she drove "very fast."

Defendant's remaining arguments as to the validity of the CDW are without merit. We agree with the trial judge that the fact that law enforcement was able to arrange for a controlled buy is "of no moment" because the fact that surveillance in a single location could be accomplished does not guarantee that law enforcement would have been able to identify the stash location or surveil defendant and J.S. under more difficult conditions without being noticed. Additionally, any allegations of false statements are belied by the record,

16

including Captain Bachok's testimony, which the judge found credible.  Finally, we are not persuaded by defendant's contention that the CDW violated the New Jersey Wiretapping and Electronic Surveillance Control Act.[6]

Next, we address whether the warrantless entry onto the premises of the storage facility was unconstitutional.  To determine whether law enforcement has conducted a search in violation of the Fourth Amendment of the United States Constitution, the judge must consider two prongs:  (1) whether "a person . . . exhibited an actual (subjective) expectation of privacy" and (2) whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'"  State v. Hempele, 120 N.J. 182, 198 (1990) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  However, under Article I, Paragraph 7 of the New Jersey Constitution, the judge need only consider the second,

---

[6] There is little case law addressing this statute, and it is not clear that it governs the CDW here.  Defendant seems to rely on N.J.S.A. 2A:156A-10(c), which requires probable cause that "[n]ormal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ."  However, the language preceding section (c) explains that this requirement applies to requests for "the interception of a wire, electronic or oral communication."  N.J.S.A. 2A:156A-10.  Having reviewed the definitions of each of these forms of communication, see N.J.S.A. 2A:156A-2, it is not clear that a device tracking the physical location of a vehicle falls within any of these categories.  Nonetheless, we find that law enforcement expressed a valid need for the tracker and explained why they were unlikely to succeed in surveilling defendant and J.S. through normal investigative procedures.

A-0689-18T2

objective prong.  Id. at 200 ("[T]he New Jersey Constitution requires only that an expectation of privacy be reasonable.").

"[E]xpectations of privacy are established by general social norms."  Ibid. (quoting Robbins v. California, 453 U.S. 420, 428 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798 (1982)).  The relevant inquiry is whether, if a warrantless search is held constitutional, "the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society."  Id. at 201 (quoting Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 403 (1974)).

We have not previously considered the reasonable expectation of privacy on the premises of a privately owned storage facility.  Accordingly, in addition to reviewing our limited case law on the reasonable expectation of privacy on the premises of a business generally, we consider principles our courts have relied on in addressing privacy interests in other contexts.  In doing so, we keep in mind that our Supreme Court has "extended [constitutional] protections beyond those dictated by the United States Supreme Court in many situations." Kevin G. Byrnes, New Jersey Arrest, Search & Seizure § 2:4-1 (2019-2020) (collecting cases); see, e.g., Hempele, 120 N.J. at 223 (holding that under Article

I, Paragraph 7 of the New Jersey Constitution, law enforcement must obtain a warrant to search a garbage bag left at the curb for collection, in contrast with the United States Supreme Court's holding in California v. Greenwood, 486 U.S. 35, 40-41 (1988)).

Our Supreme Court has acknowledged that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," but "[w]hat a person . . . seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Hempele, 120 N.J. at 209 (first and fourth alterations in original) (first quoting Greenwood, 486 U.S. at 41; then quoting Katz, 389 U.S. at 351). For example, law enforcement may lawfully enter a business premises without a warrant and search the areas not sought to be kept private from the general public. See State v. Williams, 84 N.J. 217, 220 (1980) (holding that a warrantless entry into the locked, basement storage room of a bar was unlawful); State v. Boynton, 297 N.J. Super. 382, 384 (App. Div. 1997) (holding that a warrantless entry into the unlocked, single-occupancy restroom of a bar was lawful).

In considering the reasonable expectation of privacy in a garbage bag left at the curb for collection, our Supreme Court noted that because garbage contains "[c]lues to people's most private traits and affairs," it is reasonable that

they would "prefer that [their] garbage remain private."  Hempele, 120 N.J. at 201, 202.  "The accessibility of garbage to outsiders, however, is not dispositive, because a person can maintain a privacy interest in something that is not completely invulnerable to prying eyes."  Id. at 204.  If the opposite were true, "[A]rticle I, [P]aragraph 7 would protect only that which is under lock-and-key."  Ibid.  Quoting from Justice Brennan's Greenwood dissent, the Court explained,

> The mere possibility that unwelcome meddlers might open and rummage through [trash] containers does not negate the expectation of privacy in its contents any more than the possibility of a burglary negates an expectation of privacy in the home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone.
>
> [Ibid. (alteration in original) (quoting Greenwood, 486 U.S. at 54 (Brennan, J., dissenting)).]

See also Amsterdam, 58 Minn. L. Rev. at 406 (explaining that the government cannot conduct a warrantless search of parked cars even though "[e]very person who parks his or her car on a side street in Greenwich Village voluntarily runs the risk that it will be burglarized").

The Court explained that "a person's expectation of privacy can differ in regard to different classes of people."  Hempele, 120 N.J. at 205.  "Although a

person may realize that an unwelcome scavenger might sort through his or her garbage, 'such expectations would not necessarily include a detailed, systematized inspection of the garbage by law enforcement personnel.'" Ibid. (quoting Smith v. State, 510 P.2d 793, 803 (Alaska 1973) (Rabinowitz, C.J., dissenting)); see also State v. McAllister, 184 N.J. 17, 31 (2005) ("A bank customer may not care that employees of the bank know a lot about his financial affairs, but it does not follow that he is indifferent to having those affairs broadcast to the world or disclosed to the government." (quoting Richard Posner, The Economics of Justice 342 (1981))); State v. Sencion, 454 N.J. Super. 25, 29 (App. Div. 2018) (holding that there is "a reasonable expectation of privacy from a forced police entry into the locked common area of [an] apartment building"); State v. Jefferson, 413 N.J. Super. 344, 350-52 (App. Div. 2010) (holding that police unlawfully entered the common hallway of an apartment building when a sergeant "wedged herself in the doorway" to prevent the defendant from closing the door, which was normally kept locked).

In the present case, the judge reasoned that law enforcement lawfully entered the premises of the storage facility because unit 3020 was visible from the street, and lessees of other storage units could have viewed the contents of unit 3020 had they been on the premises at the time. Considering the principles

A-0689-18T2

our courts have relied on in determining whether an expectation of privacy exists in other contexts, and based on Captain Bachok's testimony, we conclude, for a different reason, that there was no expectation of privacy on the premises of the storage facility. See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion.").

We first note that the judge's reliance on the fact that unit 3020 could be seen from the street does not alone support his conclusion. Our Court has explained that "a person can maintain a privacy interest in something that is not completely invulnerable to prying eyes." Hempele, 120 N.J. at 204. Moreover, it is not clear from the record that the suitcase containing the marijuana, located inside unit 3020, was visible from the street or another public space.[7]

---

[7] Captain Bachok's testimony is unclear as to precisely where Detective Sergeant Sahanas was located when he was in the bushes, and the Captain indicated that it was possible he was standing outside of the facility. In its appellate brief, the State asserts that members of law enforcement located outside of the facility observed all of defendant's actions inside unit 3020. However, a review of the record, including the judge's factual findings, does not support the State's assertions, as there appears to be no definitive testimony that any of the officers were outside of the facility when the suitcase was observed.

A-0689-18T2

Additionally, that lessees of other storage units could have observed defendant while on the premises would not preclude a determination that there was a reasonable expectation of privacy where it is clear that a particular space was intended to be kept private from the public. See Hempele, 120 N.J. at 209; Williams, 84 N.J. at 222; Sencion, 454 N.J. Super. at 29; Jefferson, 413 N.J. Super. at 350-52. A fence surrounded the storage facility and a gate and keypad guarded entry to the premises, so it is reasonable to conceive that the owner of the storage facility and the lessees might have expected privacy under certain circumstances.

However, Captain Bachok testified that the gate was open when he entered the storage facility and that it may have been open when other officers entered because he was unaware of anyone having the passcode. The judge found this testimony credible, and we have no reason to question his findings. See Boone, 232 N.J. at 425-26. We have held that where the record is clear that an entrance to a residential space was locked to prevent the public from entering, law enforcement's entry without permission violated a reasonable expectation of privacy, see Sencion, 454 N.J. Super. at 29 (forcing entry at a locked door); Jefferson, 413 N.J. Super. 350-52 (preventing the defendant from closing a door he normally kept locked), and "[w]e consider the fact of whether a door is locked

or unlocked a . . . reliable predictor of a reasonable expectation of privacy," State v. Nunez, 333 N.J. Super. 42, 51-52 (App. Div. 2000) (holding that where the record "would not support a finding that both doors to [a multi-family] building were routinely locked and that no one was permitted to enter without the assent of a resident," the police were not required to knock before entering the building to execute a warrant on the second floor apartment); State v. Brown, 282 N.J. Super. 538, 547 (App. Div. 1995) ("[A] tenant does not have a reasonable expectation of privacy in the common areas of a building merely because doors to the common areas are normally kept locked and require a key for access.").

Although in State v. Williams, 461 N.J. Super. 1, 17-19 (App. Div. 2019), certif. granted, 240 N.J. 429 (2020), we held that law enforcement may not enter the common areas of a boarding house without permission and explained that where a door with a lock is left unlocked, for law enforcement to enter lawfully without a warrant, the State must demonstrate that "the communal areas were open to the public," Williams does not apply here. "We stress[ed] that our decision [was] limited to the specific facts of [that] case," given that the living arrangements in a boarding house are different from those in an apartment building. Id. at 15. We cannot conclude that a storage facility is more similar

to a rooming house than it is to an apartment building and therefore entitled to greater protection than an apartment building.

Because the storage facility was unlocked when law enforcement arrived, and the record is devoid of evidence showing that law enforcement was required to obtain authorization before entering the premises, we conclude that their entry did not violate an expectation of privacy. Therefore, any observations made after they entered the facility were lawful and could be used to support the application for the search warrant for unit 3020 and the detention of defendant.

We now address defendant's contention that law enforcement unlawfully detained him. It is well established that an investigatory stop by law enforcement "implicates our constitutional protections." State v. Mann, 203 N.J. 328, 337 (2010). An investigatory stop, or Terry[8] stop, occurs "when an objectively reasonable person feels that his or her right to move has been restricted." State v. Rodriguez, 172 N.J. 117, 126 (2002). Absent a warrant, such a stop is lawful "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Ibid. (quoting Terry, 392 U.S. at 21). Our Supreme Court has further explained,

---

[8] Terry v. Ohio, 392 U.S. 1 (1968).

A-0689-18T2

An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced. Such observations are those that, in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonabl[y] warrant the limited intrusion upon the individual's freedom.

[Id. at 127 (alterations in original) (quoting State v. Davis, 104 N.J. 490, 504 (1986)).]

When an investigatory stop is based on a tip from an informant, the "informant's 'veracity,' 'reliability,' and 'basis of knowledge' are 'relevant in determining the value of his report.'" Ibid. (quoting Alabama v. White, 496 U.S. 325, 328 (1990)). Therefore, law enforcement generally "must verify that the tip is reliable by some independent corroborative effort." Ibid.

A continued investigatory stop is lawful if it is "reasonable at its inception," and "the scope of the continued detention [is] reasonably related to the justification for the initial interference." State v. Coles, 218 N.J. 322, 344 (2014). Law enforcement "must use the least intrusive means necessary to effectuate the purpose of the investigative detention." Ibid. However, if a stop is more intrusive than necessary, it becomes a de facto arrest. State v. Dickey,

152 N.J. 468, 478 (1998). There is no bright line test to determine the point at which a stop becomes a de facto arrest, but our Supreme Court has identified several guiding factors: unnecessary delay, fear and humiliation resulting from law enforcement's conduct, transportation of the detained person to another location, isolation of the person, or confinement of the person. Id. at 479. A de facto arrest is lawful only if supported by probable cause. Id. at 478.

Here, the judge correctly concluded that law enforcement had reasonable suspicion that criminal activity was occurring on the premises of the storage facility. Considering the length of defendant's detention, we add that even if the stop became a de facto arrest, it was lawful because it was reasonable for law enforcement to believe there was a fair probability that marijuana would be found inside unit 3020.

The Narcotics Unit received several confidential tips that defendant and J.S. were dealing marijuana, allowing the officers to organize a controlled buy from J.S. and to secure a tracker for the black BMW. By using the tracker, law enforcement was able to observe what they believed were "hand to hand drug transactions," and they were able to locate what appeared to be defendant and J.S.'s "stash location": unit 3020 at the storage facility. Further, they verified that defendant and J.S. flew to California separately and quickly returned to New

Jersey. Soon after, they observed J.S. receive a FedEx package and almost immediately drive to the storage facility. Then, on the night of October 5, mere hours after defendant apparently returned from California, law enforcement observed him wheeling a suitcase inside of unit 3020, or the "stash location." Having been able to corroborate the CIs' tips, we conclude that it was reasonable for law enforcement to believe there was a fair probability that the suitcase defendant was wheeling contained marijuana.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0689-18T2